# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **INTERNATIONAL COUNSEL** ) | |
| **BUREAU** ) | |
|     Dasman Complex ) | |
|     Block No. 3 -- 8th Floor ) | |
|     Al Sharq ) | |
|     Safat ) | |
|     Kuwait ) | |
| ) | |
|         **Plaintiff,** ) | |
| ) | **Civil Action No. _____** |
| ) | **COMPLAINT** |
|     **v.** ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **DEFENSE** ) | |
|     The Pentagon ) | |
|     Washington, D.C. 20301-1000 ) | |
| ) | |
| ) | |
| ) | |
| **UNITED STATES CENTRAL** ) | |
| **INTELLIGENCE AGENCY** ) | |
|     Central Intelligence Agency ) | |
|     Washington, D.C. 20505 ) | |
| ) | |
| ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **JUSTICE** ) | |
|     950 Pennsylvania Avenue, NW ) | |
|     Washington, D.C. 20530-0001 ) | |
| ) | |
| ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **STATE** ) | |
|     2201 C Street, NW ) | |
|     Washington, D.C. 20520-0099 ) | |
| ) | |
| ) | |

**UNITED STATES FEDERAL**      )
**BUREAU OF INVESTIGATION**    )
     935 Pennsylvania Avenue, NW  )
     Washington, D.C. 20535-0001   )
                               )
           **Defendants**.      )
                               )

## PRELIMINARY STATEMENT

1.     This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking an order requiring the Defendants United States Department of Defense ("DoD"), United States Central Intelligence Agency ("CIA"), United States Department of Justice ("DoJ"), United States Department of State ("DoS"), and the United States Federal Bureau of Investigation ("FBI") (collectively "Defendants") and their components, immediately to produce agency records requested by Plaintiff International Counsel Bureau ("ICB").

2.     ICB submitted various FOIA requests to the Defendants seeking (a) records containing references to or reflecting the terms of the policies and practices of the U.S. Government ("USG") relating to the transfer, release and/or continued detention of detainees held at the U.S. prison facility at Guantanamo Bay, Cuba; (b) records containing references to or reflecting the terms of the policies and practices of the USG relating to hunger strikes by detainees at Guantanamo Bay; and (c) records relating to two Kuwaiti citizens who are detainees at Guantanamo Bay: Fawzi Khaled Abdullah Fahad Al Odah and Fayiz Mohammed Ahmed Al Kandari ("the Kuwaiti Detainees"), all of which concern matters of significant public interest. *See Int'l Counsel Bureau v. Dep't of Def.*, 723 F. Supp. 2d 54, 66 (D.D.C. 2010) ("The press has taken a substantial interest in the Guantanamo Bay detainees, and has reported extensively on them and their condition. . . . The Court need not linger on this point to conclude that photographs of these detainees taken at Guantanamo Bay are of significant public interest.").

3.     Defendants have not released any records in response to any of the requests and have otherwise failed to meet their obligations under the FOIA.

4.     The U.S. prison facility at Guantanamo Bay has long been and remains a subject of great controversy in the United States, but as stated in the March 19, 2009 memorandum issued by Attorney General Eric Holder on the responsibility placed upon executive agencies by FOIA: "The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears."  Memorandum for the Heads of Executive Departments and Agencies, Office of the Attorney General, March 19, 2009, *available at* http://www.justice.gov/ag/foia-memo-march2009.pdf.

5.     ICB seeks an order requiring Defendants to immediately process ICB's outstanding FOIA requests and to release all records that Defendants have unlawfully withheld from ICB.

## I.      RELATED CASE

6.     This case is related to Civil Action No. 09-2269, as defined by Local Rule of Civil Procedure 40.5(a)(3), currently pending before Judge Bates in this Court.

7.     The instant action relates, in part, to documents held by the Defendants that may overlap with the documents requested from Defendants in Civil Action No. 09-2269.

8.     In the requests at issue in Civil Action No. 09-2269, ICB requested, *inter alia*, (a) records containing references to or reflecting the terms of the policies and practices of the USG relating to the transfer and/or release of detainees held at Guantanamo Bay, Cuba; (b) disciplinary records relating to the Kuwaiti Detainees; and (c) records that depict or reflect the image, likeness, or any other aspect or activity of the Kuwaiti Detainees.

9. ICB's FOIA requests in the instant action include, *inter alia*, requests to Defendants for records concerning the same or substantially similar subject matter as the records at issue in Civil Action No. 09-2269.

10. In Civil Action No. 09-2269, Defendants are presently producing documents to ICB pursuant to an agreement between the parties. Defendants in that case have asserted various FOIA exemptions with respect to records that are responsive to the requests described in paragraph 8. Per the May 7, 2013 scheduling order in Civil Action No. 09-2269, the parties will propose a schedule for summary judgment briefing on any remaining issues no later than November 15, 2013.

11. The nature and content of the related documents are thus common issues of fact between the instant case and the ongoing Civil Action No. 09-2269 before Judge Bates of this Court.

12. This case should proceed as a related case to Civil Action No. 09-2269 before Judge Bates to avoid the risk of conflicting determinations regarding the Defendants' assertion of FOIA exemptions over certain documents at issue in this instant action and in Civil Action No. 09-2269.

13. The instant case should also proceed as a related case to Civil Action No. 09-2269 because it relates in part to FOIA requests filed on behalf of the same two Kuwaiti Detainees.

## II.     JURISDICTION AND VENUE

14. This Court has jurisdiction over this action and these parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(E)(iii). This Court also has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331. Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B).

### III.    PARTIES

15.    Plaintiff ICB is a Kuwaiti law firm representing the families of the Kuwaiti

Detainees.

16.    All Defendants are Departments of the Executive Branch of the U.S. Government

and are agencies within the meaning of 5 U.S.C. § 552(f)(1).

### IV.    FACTS

17.    The Kuwaiti Detainees are imprisoned under strict security conditions, with no

contact with non-jailers except tightly controlled attorney visits, infrequent letters, and extremely

rare and tightly controlled telephone conversations with their families, and they may be subjected

to abusive practices during their ongoing and indefinite internment at Guantanamo.

18.    Requester ICB represents the families of the Kuwaiti Detainees, for whom FOIA

is a principal way for them to learn any details regarding the health, safety, and condition of their

children.

### Internment Of The Kuwaiti Detainees
### By The U.S. Military At Guantanamo Bay

19.    The Kuwaiti Detainees are two Kuwaiti citizens who were taken into custody by

the U.S. Military either in Afghanistan or at or near the Afghanistan-Pakistan border in late 2001

and early 2002.

20.    Both of the Kuwaiti Detainees were in Afghanistan in the Fall of 2001, assisting

refugees and performing other charitable activities.  After the conflict in Afghanistan began in

the aftermath of the September 11, 2001 attacks on the United States, the Kuwaiti Detainees

sought to flee Afghanistan.  Unable to return directly to Kuwait, they attempted to travel over

land to Pakistan.  They subsequently were captured or detained, one by Northern Alliance

soldiers and one by the Pakistani Government, and turned over to the custody of the United

States.

21.     Despite more than 11 years of internment and interrogation, the Kuwaiti

Detainees have not been formally charged with any crime.

**Rehabilitation Agreements**

22.     In order to obtain the repatriation of its citizens detained at Guantanamo Bay,

Saudi Arabia initiated a comprehensive rehabilitation program and more than 100 of about 130

of its citizens have since returned to Saudi Arabia from Guantanamo Bay.  (*See* Farah Stockman,

"More Saudis are freed from Guantanamo," The Boston Globe, Nov. 22, 2007.)

23.     The head of the Pentagon office overseeing detainee review in 2007 stated that

conduct of similar rehabilitation programs by other nations would lead to further releases.  (*Id.*)

24.     Conversely, failure to establish a satisfactory rehabilitation program is reportedly

a cause for delay or denial of such releases.  (*See* Jay Solomon, "Transfer of Gitmo Detainees

Hits Snags," The Wall Street Journal, Oct. 28, 2008.)

25.     On January 22, 2010, the Guantanamo Review Task Force, established pursuant

to Executive Order 13492, issued its Final Report on the proper disposition of the detainees at

Guantanamo Bay.  Dep't of Justice *et al.*, Final Report, Guantanamo Review Task Force,

January 22, 2010.  The Final Report states that, with regard to transfer decisions for certain

detainees, "the review participants considered the availability of rehabilitation programs and

mental health treatment in the receiving country."  *Id.* at 17.

26.     Furthermore, DoD implementing guidelines for the periodic review of detainees

per Executive Order 13567 direct that, in assessing whether continued detention is warranted for

a detainee, the Periodic Review Board ("PRB") is to consider "[t]he likelihood of family, tribal,

or government rehabilitation or support for the detainee."  Directive-Type Memorandum

("DTM") 12-005, "Implementing Guidelines for Periodic Review of Detainees Held at

Guantanamo Bay per Executive Order 13567" at 7, Dep't of Defense, May 9, 2012 ["DTM-12-

005"].

      27.     In an effort to obtain the repatriation of its citizens detained at Guantanamo, in

2013, officials in Yemen informed the USG of its plan for a rehabilitation program to ensure

transferees will be rehabilitated and reintegrated into society.  (*See, e.g.*, Julian E. Barnes et al.,

"Obama Restarts Bid to Close Guantanamo," The Wall Street Journal, May 22, 2013.)

      28.     Upon information and belief, Defendants DoD, CIA, DoJ, and DoS have at

various times participated in the creation of, generated, or received documents relating to

negotiations with foreign governments over such programs.

### Bilateral Security Agreements

      29.     The USG has acknowledged that, before making a transfer decision to a specific

country, it seeks assurances from that foreign government that it will treat the detainee

humanely.  The USG, in the Guantanamo Review Task Force Final Report, also acknowledged

that, regarding transfer decisions for certain detainees, "transfer decisions were made subject to

the implementation of appropriate security measures in the receiving country, and extensive

discussions are conducted with the receiving country about such security measures before any

transfer is implemented."  Dep't of Justice *et al.*, Final Report, Guantanamo Review Task Force

at 17, January 22, 2010.

      30.     In 2011, the DoS Special Envoy for the Closure of Guantanamo reiterated that the

USG engages in discussions with foreign governments to develop "security assurances

appropriate to the detainee" and "encourage measures to facilitate the former detainees'

successful reintegration into the receiving country."  (Statement of Ambassador Daniel Fried,

DoS, Subcommittee on Oversight and Investigations of the Committee on Armed Services, U.S.

House of Representatives, April 13, 2011.)

31.    Furthermore, the DoD implementing guidelines for the periodic review of

detainees per Executive Order 13567 direct the PRB to consider information pertaining to the

detainee's potential threat if transferred or released, including "[t]he availability and credibility

of measures by the receiving government to mitigate substantially the assessed threat posed by

the detainee, including information regarding past detainee transfers to that country, if

applicable."  DTM-12-005 at 8.

32.    Upon information and belief, Defendants DoD, CIA, DoJ, and DoS have at

various times participated in the creation of, generated, or received documents relating to or

reflecting the terms of bilateral security agreements entered into by USG and foreign countries

relating to the transfer of prisoners from Guantanamo Bay.

**Terms And Conditions Of Release**

33.    Detainees have been released from Guantanamo Bay into the custody of various

foreign governments, including Albania, Algeria, Afghanistan, Australia, Bangladesh, Bahrain,

Belgium, Bermuda, Canada, Chad, Denmark, Egypt, France, Hungary, Iran, Iraq, Ireland, Italy,

Jordan, Kuwait, Libya, Maldives, Mauritania, Morocco, Pakistan, Palau, Portugal, Russia, Saudi

Arabia, Somalia, Spain, Sweden, Switzerland, Sudan, Tajikistan, Turkey, Uganda, the United

Kingdom, and Yemen.

34.    Upon information and belief, Defendants DoD, CIA, DoJ, and DoS have at

various times participated in the creation of, generated, or received documents relating to or

reflecting the terms and conditions on which persons detained at Guantanamo Bay have been

released or transferred to various governments, including the countries listed in paragraph 33.

## Certifications Relating to the Transfer of Detainees

35.      On January 2, 2013, President Obama signed into law the National Defense

Authorization Act of 2013 ("NDAA FY 2013"), Public Law 112-239.  Section 1028, titled

"Requirements for Certifications Relating to the Transfer of Detainees at United States Naval

Station, Guantanamo Bay, Cuba, to Foreign Countries and Other Foreign Entities," provides that,

with limited exception, "the Secretary of Defense may not use any amounts authorized to be

appropriated or otherwise available to the Department of Defense for fiscal year 2013 to transfer

any individual detained at Guantanamo to the custody or control of the individual's country of

origin, any other foreign country, or any other foreign entity" unless the Secretary first submits

to Congress the "certification" as described in Section 1028(b).  NDAA FY 2013, P.L. 112-239,

§ 1028(a), 126 Stat. 1632, 1914-15 (2013).

36.      Section 1028 describes the required "certification" as a written certification made

by the Secretary of Defense, with the concurrence of the Secretary of State and in consultation

with the Director of National Intelligence, that the government or recognized leadership of the

foreign country to which the detainee is to be transferred: (a) is not a designated state sponsor of

terrorism or a designated foreign terrorist organization; (b) maintains control over each detention

facility in which the individual is to be detained if the individual is to be housed in a detention

facility; (c) is not, as of the date of the certification, facing a threat that is likely to substantially

affect its ability to exercise control over the individual; (d) has taken or agreed to take effective

actions to ensure that the individual cannot take action to threaten the United States, its citizens,

or its allies in the future; (e) has taken or agreed to take such actions as the Secretary determines

necessary to ensure that the individual cannot engage or reengage in any terrorist activity; and (f) has agreed to share with the United States any information that is related to the individual or any associates of the individual and could affect the security of the United States, its citizens, or its allies.  NDAA FY 2013, P.L. 112-239, § 1028(b).  The certification must also include an assessment "of the capacity, willingness, and past practices (if applicable) of the foreign country or entity in relation to the Secretary's certifications."  *Id.*

37.     Section 1028(c) provides that, with limited exception, "the Secretary of Defense may not use any amounts authorized to be appropriated or otherwise made available to the Department of Defense to transfer any individual detained at Guantanamo to the custody or control of the individual's country of origin, any other foreign country, or any other foreign entity if there is a confirmed case of any individual who was detained at United States Naval Station, Guantanamo Bay, Cuba, at any time after September 11, 2001, who was transferred to such foreign country or entity and subsequently engaged in any terrorist activity."  NDAA FY 2013, P.L. 112-239, § 1028(c)

38.     Section 1028(d) permits the Secretary of Defense to waive certain of the Section 1028(b) certification requirements and the prohibition in Section 1028(c).  NDAA FY 2013, P.L. 112-239, § 1028(d)(1).  This waiver is permitted when the Secretary, with the concurrence of the Secretary of State and in consultation with the Director of National Intelligence, makes a determination that alternative actions will be taken "to address the underlying purpose of the requirement or requirements to be waived" and that transfer is in the national security interests of the United States.  *Id.*  For waivers of Section 1028(b), the Secretary must determine that the alternative actions will substantially mitigate risks addressed in Section 1028(b).  *Id.*  For waivers of Section 1028(c), the Secretary must certify the criteria required by Section 1028(b)

and determine that the alternative actions will mitigate the risk of recidivism.  *Id.*  When the

Secretary makes a waiver determination under Section 1028(d), the Secretary must submit a

report to Congress prior to transfer of the detainee.  *Id.* § 1028(d)(2).

39.     Upon information and belief, Defendants DoD, CIA, DoJ, and DoS have at

various times participated in the creation of, generated, or received documents relating to or

reflecting the certifications, waivers, and assessments relating to the transfer of detainees at

Guantanamo to foreign countries and other foreign entities required or permitted under Section

1028.

**Guantanamo Bay Interagency Task Forces**

40.     On January 22, 2009, President Obama signed an executive order calling for the

establishment of a Special Interagency Task Force on Interrogation and Transfer Policies.  Exec.

Order No. 13491, 74 Fed. Reg. 4893 (Jan. 27, 2009).

41.     On the same day, President Obama also ordered another task force to review

detention policy options, the Special Interagency Task Force on Detainee Disposition.  Exec.

Order No. 13493, 74 Fed. Reg. 4901 (Jan. 27, 2009).

42.     According to a DoJ press release, the Special Interagency Task Force on Detainee

Disposition issued its preliminary report on military commissions and a process for the

determination of prosecution forums for trials of suspected terrorists on July 21, 2009.

43.     According to a DoJ press release, the Special Interagency Task Force on

Interrogations and Transfer Policies issued its recommendations to the President on August 24,

2009.

44.     On March 7, 2011, President Obama issued an executive order establishing a

process to periodically review whether the continued detention of a detainee at Guantanamo Bay

is necessary "to protect against a significant threat to the security of the United States." Exec.

Order No. 13567, 76 Fed. Reg. 13277 (March 7, 2011).

45.     Executive Order 13567 provides that a PRB, composed of officials from several

U.S. departments and agencies, shall review the grounds for the continued detention of detainees

at Guantanamo who have either been: 1) designated for continued law of war detention; or 2)

referred for criminal prosecution, but have yet to be formally charged with an offense.  Exec.

Order No. 13567, 76 Fed. Reg. 13277 (March 7, 2011).

46.     An initial review of each detainee covered by the executive order involves a

hearing before the PRB in which the detainee and his representative may challenge the USG's

basis for his continued detention and introduce evidence on his own behalf.  Exec. Order No.

13567, 76 Fed. Reg. 13277 (March 7, 2011).  The Secretary of Defense, in coordination with

other relevant U.S. agencies, is to "compile and provide to the PRB" information relevant to the

periodic review of each detainee.  *Id.*  Those persons deemed to be subject to continued detention

will have their cases reviewed periodically thereafter.  *Id.*

47.     The PRBs were to begin reviewing the grounds for the continued detention of

covered individuals within one year of the issuance of the executive order, i.e., by March 7,

2012.  Exec. Order No. 13567, 76 Fed. Reg. 13277 (March 7, 2011).  According to media

reports, as of July 2013, the USG was preparing to start the PRB review process.  (*See* Carol

Rosenberg, "Pentagon Prepares Review Panels for 71 Guantanamo Detainees," Miami Herald,

July 21, 2013.)  According to DoD, the PRB process is currently underway.  (*See* Press Release,

Dep't of Defense, "Periodic Review Board Process Underway," Oct. 9, 2013.)

48.     On May 9, 2012, DoD released DTM 12-005, "Implementing Guidelines for

Periodic Review of Detainees Held at Guantanamo Bay per Executive Order 13567."  The DTM,

which implements Executive Order 13567, establishes "a policy and process to review, on a periodic basis, the Executive branch's continued discretionary exercise of existing detention authority over detainees held at Guantanamo Bay, Cuba (GTMO) pursuant to the Authorization for Use of Military Force, in individual cases." DTM 12-005 at 1.

49.     Upon information and belief, Defendants DoD, DoJ, and DoS have at various times participated in the creation of, generated, or received documents relating to the PRBs and one or both of the aforementioned task forces.

## Continued Law of War Detention of Detainees at Guantanamo Bay

50.     Executive Order 13567 also establishes a Review Committee, composed of relevant U.S. department heads and officials, to annually review the sufficiency and efficacy of transfer efforts relating to detainees at Guantanamo. Following the completion of the PRB's initial review of the disposition of detainees, and every four years thereafter, the Review Committee is charged with assessing "whether a continued law of war detention policy remains consistent with the interests of the United States, including national security interests." Exec. Order No. 13567, 76 Fed. Reg. 13277 (March 7, 2011). Executive Order 13567 defines "Law of War Detention" as "detention authorized by the Congress under the [Authorization for the Use of Military Force], as informed by the laws of war." *Id.*

51.     The Authorization for the Use of Military Force ("AUMF"), Pub. Law 107-40, 115 Stat. 224 (2001), grants the President the authority to "use all necessary and appropriate force against those nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."

52.     On March 13, 2009, DoJ filed a memorandum in this Court outlining the USG's

detention authority relative to detainees held at Guantanamo Bay.  *See* Dep't of Justice,

Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at

Guantanamo Bay, Guantanamo Bay Detainee Litig., No. 08-442 (D.D.C. March 13, 2009).  In

this memorandum, DoJ states that "the Government is refining its position with respect to its

authority to detain those persons who are now being held at Guantanamo Bay."  *Id.* at 1.  DoJ

argues that, under the AUMF,

> The President has the authority to detain persons that the President
> determines planned, authorized, committed, or aided the terrorist
> attacks that occurred on September 11, 2001, and persons who
> harbored those responsible for those attacks. The President also has
> the authority to detain persons who were part of, or substantially
> supported, Taliban or al-Qaida forces or associated forces that are
> engaged in hostilities against the United States or its coalition
> partners, including any person who has committed a belligerent
> act, or has directly supported hostilities, in aid of such enemy
> armed forces.

*Id.* at 1-2.

53.     Upon information and belief, Defendants DoD, CIA, DoJ, and DoS have at

various times participated in the creation of, generated, or received documents relating to the

continued law of war detention of detainees at Guantanamo Bay, the meaning of the phrase

"persons [the President] determines planned, authorized, committed, or aided the terrorist

attacks" as it is used in the AUMF, and/or the aforementioned term "associated forces" as it is

used in the March 13, 2009 DoJ Memorandum.

**Hunger Strikes By Detainees at Guantanamo**

54.     On or about February 2013, a group of detainees at Guantanamo Bay commenced

a hunger strike.  In July 2013, the USG acknowledged that detainees were participating in a

hunger strike "to protest their continued detention." Resp'ts' Opp'n at 2, Dhiab v. Obama, No. 05-CV-1457 (D.D.C. July 3, 2013).

55.     Joint Task-Force-Guantanamo ("JTF-GTMO") has established procedures to address the medical care and treatment of detainees participating in a hunger strike. According to the DoD Standard Operating Procedures ("SOPs"), detainees who meet the definition of a "hunger striker" and are approved for involuntary feeding by the Commander, JTF-GTMO, must undergo an enteral, or involuntary feeding, medical procedure, in which the detainee is restrained in a chair restraint system and an enteral feeding tube is passed via the nasal passage into the detainee's stomach. *See* Joint Task Force Guantanamo Bay, Cuba, Joint Medical Group, Standard Operating Procedure No. JTF-JMG 001, March 5, 2013 ["JTF-JMG 001"]. The process "usually lasts 30 to 40 minutes." Resp'ts' Opp'n at 4, Dhiab v. Obama, No. 05-CV-1457 (D.D.C. July 3, 2013). "Intermittent enteral feedings are usually done two times a day." JTF-JMG 001.

56.     The USG has stated that enteral, or force feeding, is related to "preserving order, security, and discipline within the detention facility." Resp'ts' Opp'n at 2, Dhiab v. Obama, No. 05-CV-1457 (D.D.C. July 3, 2013).

57.     At the peak of the hunger strike, 106 of the 166 prisoners were listed as participants per the military's official count. (*See* Charlie Savage, "Guantanamo Hunger Strike Is Largely Over, U.S. Says," The New York Times, September 23, 2013.)

58.     In April 2013, the U.S. military sent additional medical personnel to Guantanamo to address the ongoing hunger strike. (*See* Jane Sutton, "U.S. Sending More Medics to Guantanamo Bay as Hunger Strike Grows," Reuters, April 22, 2013.)

59.     U.S. military personnel have acknowledged that guards at Guantanamo are encountering an increasing number of "Code Yellow" alerts.  (*See* Ryan J. Reilly, "Guantanamo Detainee Medical Incident Prompts Evacuation of Reporters," Huffington Post, April 18, 2013.) According to media accounts, Code Yellow alerts occur when guards must call in a medical response because a detainee "didn't wake up or wasn't showing enough movement for the guard to verify," and that recently, these alerts have "been happening fairly, very frequently."  (*Id.*; *see also* Jonathan Beale, "Inside Guantanamo Bay's 'Longest Hunger Strike,'" BBC News, April 30, 2013.)

60.     Upon information and belief, Defendant DoD has at various times participated in the creation of, generated, or received documents relating to or reflecting hunger strikes by detainees at Guantanamo Bay.

## Statutory Framework of FOIA

61.     The Freedom of Information Act requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

62.     Upon receipt of a letter requesting records under FOIA, an agency is required to make a "determination" on any FOIA request within 20 days of receipt.  5 U.S.C. § 552(a)(6)(A)(i).  Agencies can take another ten days in "unusual circumstances." *Id.* § 552(a)(6)(B).

63.     The "determination" letter must state whether the agency will comply with such request and "shall immediately notify the person making such request of such determination and the reasons therefore, and of the right of such person to appeal to the head of the agency any adverse determination."  5 U.S.C. § 552(a)(6)(A)(i).  An agency response that merely acknowledges receipt of a request is an interim response and does not constitute a

"determination" under the FOIA.  *See DoJ Guide to the Freedom of Information Act* at 743

(citing *Martinez v. FBI*, 3 Gov't Disclosure Serv. (P-H) ¶ 83,005, at 83,435 (D.D.C. Dec. 1,

1982)).

64.     If the agency issues an adverse determination, the requester can appeal

administratively.  An agency is required to make a determination with respect to any appeal

within twenty days of receiving the appeal.  5 U.S.C. § 552(a)(6)(A)(ii).  Agencies can take

another ten days in "unusual circumstances."  *Id.* § 552(a)(6)(B).  If, upon appeal, the denial of

the request is upheld in whole or in part, the agency must notify the requester of the right to

judicial review of that determination.  *Id.* § 552(a)(6)(A)(ii).

65.     If the statutory period for response to a FOIA request lapses without a

determination, or if the statutory period for response to an administrative appeal lapses without a

determination of the appeal, FOIA provides that the requester "shall be deemed to have

exhausted his administrative remedies with respect to such request," and the requester may seek

judicial review.  5 U.S.C. § 552(a)(6)(C)(i).  *See also Wildlands CPR v. U.S. Forest Serv.*, 558 F.

Supp. 2d 1096, 1102-03 (D. Mont. 2008) (finding constructive exhaustion where agency did not

timely adjudicate administrative appeal); *Thomas v. FAA*, No. 05-2391, 2007 WL 2020096, at

*3-4 (D.D.C. July 12, 2007) (stating that agency's failure to respond to FOIA request within

twenty days constitutes constructive exhaustion of administrative remedies).

66.     This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency

from withholding agency records and to order the production of any agency records improperly

withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).

## The FOIA Requests

67.     In May of 2013, ICB submitted a set of FOIA requests to various Defendants (the

"Policy Request"), seeking the following records:

> "1.     *Any documents created on or after September 30, 2011,*
> *relating to or reflecting the terms of any program or*
> *requirement imposed by or negotiated between the United*
> *States Government ("USG") and the governments of other*
> *nations relating to the rehabilitation of prisoners transferred to*
> *such other nations from the military prison at the U.S. Navy*
> *Base, Guantanamo Bay, Cuba ("Guantanamo"). This request*
> *includes, but is not limited to, (a) any document relating to*
> *negotiations by the USG with the governments of the State of*
> *Kuwait, the Kingdom of Saudi Arabia, and any and all other*
> *nations; and (b) any document relating to reviews or audits*
> *conducted by the USG assessing compliance by the*
> *governments of the State of Kuwait, the Kingdom of Saudi*
> *Arabia, and any and all other nations with the terms of such*
> *programs or the requirements imposed or negotiated.*
>
> *2.     Any documents created on or after September 30, 2011,*
> *relating to or reflecting the terms of bilateral security*
> *agreements entered into by USG and foreign countries relating*
> *to the release and/or transfer of prisoners from Guantanamo.*
> *This request includes, but is not limited to, (a) any document*
> *relating to USG monitoring of foreign government compliance*
> *with such agreements; (b) any document establishing*
> *procedures for such USG monitoring; and (c) any documents*
> *relating to or reflecting communications with foreign*
> *governments regarding compliance with such agreements.*
>
> *3.     Any document created on or after September 30, 2011,*
> *that reflects the terms and conditions on which persons*
> *detained at Guantanamo have been released or transferred to*
> *any country outside the United States, including but not limited*
> *to the following countries: The United Kingdom, Libya,*
> *Tunisia, Bahrain, Yemen, Mauritania, Saudi Arabia, Jordan,*
> *and Kuwait.*
>
> *4.     Any document relating to or reflecting the USG policies*
> *for, procedures for, planning for, and decisions, actions, or*
> *reviews regarding any and all certifications, waivers, and*
> *assessments relating to the transfer of detainees at*
> *Guantanamo to foreign countries and other foreign entities*
> *required or permitted under Section 1028 of the National*

> *Defense Authorization Act for Fiscal Year 2013, Pub. Law*
> *112-239 (2013)."*

68.   The Policy Request was sent to DoD on May 21, 2013.

   a.   On June 9, 2013, DoD responded via an email from D. Nichelson assigning

        number 13-F-0902 to the DoD Policy Request, and stating that DoD will be

        unable to respond to the DoD Policy Request within the 20-day statutory period.

   b.   On June 14, 2013, DoD responded via a letter from P. Jacobsmeyer, stating that

        the DoD Policy Request had been referred to the United States Southern

        Command ("USSOUTHCOM") for processing and direct response to ICB.  The

        letter informed ICB that DoD is continuing to process the Request.

   c.   No further response has been received from DoD or its components regarding the

        DoD Policy Request.

69.   The Policy Request was sent to CIA on May 21, 2013.

   a.   On July 11, 2013, CIA responded via letter from M. Meeks assigning number F-

        2013-01817 to the CIA Policy Request, and stating that it was unlikely that CIA

        would be able to respond within the 20-day statutory period.

   b.   No further response has been received from CIA or its components regarding the

        CIA Policy Request.

70.   The Policy Request was sent to DoJ on May 21, 2013.

   a.   On June 6, 2013, DoJ responded via a letter from R. Wilson stating that the DoJ

        Policy Request had been referred to DoJ components.

   b.   On June 27, 2013, the National Security Division responded via a letter from A.

        Mallory assigning number 13-196 to the DoJ Policy Request.

c.  On June 19, 2013, the Federal Bureau of Prisons ("BOP") responded via a letter from N. Culbertson with a denial of the DoJ Policy Request, request number 2013-08588.  BOP stated it did not locate any responsive documents after searches in the Office of the General Counsel, Central Office.

d.  No further response has been received from DoJ or its components regarding the DoJ Policy Request.

71.  The Policy Request was sent to DoS on May 21, 2013.

a.  On June 11, 2013, DoS responded via letter from M. Casto assigning number F-2013-09455 to the DoS Policy Request.

b.  No further response has been received from DoS regarding the DoD Policy Request.

72.  In May of 2013, ICB submitted a set of FOIA requests related specifically to treatment and condition of the Kuwaiti Detainees ("Disciplinary Action Request") to various Defendants, seeking the following records:

> "1.    Any and all records created on or after September 30, 2011, relating to or reflecting any alleged breaches or violations by Fayiz Mohammed Ahmed Al Kandari and/or Fawzi Khaled Abdullah Fahiz Al Odah of any governing rules of discipline and/or behavior during their detention by the United States Government ("USG").  This request includes, but is not limited to, records related to any disciplinary actions taken by personnel in response to such breaches.
>
> 2.    Any and all records created on or after September 30, 2011, relating to or reflecting any investigations into alleged abuse or mistreatment of Fayiz Mohammed Ahmed Al Kandari and/or Fawzi Khaled Abdullah Fahad Al Odah while under the control of the USG.  This request includes, but is not limited to, records related to any disciplinary actions taken against USG personnel for engaging in such abuse or mistreatment."

73.  The Disciplinary Action was sent to DoD on May 21, 2013.

20

a.  On June 9, 2013, DoD responded via an email from D. Nichelson assigning

number 13-F-0901 to the DoD Disciplinary Action Request, and stating that DoD

would be unable to respond to the DoD Disciplinary Action Request within the

20-day statutory period.

b.  On June 14, 2013, DoD responded via a letter from P. Jacobsmeyer, stating that

the DoD Disciplinary Action Request had been referred to USSOUTHCOM for

processing and direct response to ICB.  The letter informed ICB that DoD is

continuing to process the Request.

c.  No further response has been received from DoD or its components regarding the

DoD Disciplinary Action Request.

74.  The Disciplinary Action Request was sent to DoJ on May 21, 2013.

a.  On June 6, 2013, DoJ responded via a letter from R. Wilson stating that the

Request had been referred to the Criminal Division, the FBI, and the National

Security Division.

b.  On July 9, 2013, the National Security Division responded via a letter from A.

Mallory assigning number 13-197 to the DoJ Disciplinary Action Request.

c.  On July 15, 2013, the Criminal Division responded via a letter from K. Courter

assigning number CRM-201300477F to the DoJ Disciplinary Action Request.  In

the same letter, the Criminal Division stated it could neither confirm nor deny the

existence of any records responsive to ICB's request under FOIA Exemptions 6

and 7(c).

d.  On September 10, 2013, ICB submitted its appeal of the Criminal Division's

denial to the Office of Information Policy ("OIP"), arguing that there is an

overriding public interest in disclosure of records responsive to the DOJ

Disciplinary Request that outweighs any potential personal privacy interest, and

requesting that an adequate search be performed.

e.  On September 17, 2013, the OIP received ICB's appeal of the Criminal Division's

denial.

f.  At this time, no response to this appeal has been received, and more than 20 days

have passed since the OIP received ICB's appeal of the Criminal Division's

denial.

g.  No further response has been received from DoJ or its components regarding the

DoJ Disciplinary Action Request.

75.  The Disciplinary Action Request was sent to FBI on May 21, 2013.

a.  On August 16, 2013, FBI responded via a letter assigning number 122233-0 to the

FBI Disciplinary Action Request as the Request relates to Fawzi Khaled Abdullah

Fahad Al Odah.  In the same letter, FBI stated that, because the request concerned

a third party, FBI requested one of the following: 1) an authorization and consent

from the individual; 2) proof of death; 3) or justification that the public interest in

disclosure outweighs personal privacy.  FBI informed ICB that, absent this

information, the FBI could neither confirm nor deny the existence of any records

response to the request, which, if they were to exist, would be exempt from

disclosure pursuant to FOIA Exemptions 6 and 7(c).

b.  On September 10, 2013, ICB submitted its appeal of the FBI's response to the

OIP, stating that there is an overriding public interest in disclosure of records

22

responsive to the FBI Disciplinary Request that outweighs any potential personal privacy interest, and requesting that an adequate search be performed.

c.   On September 17, 2013, the OIP received ICB's appeal.

d.   At this time, no response to this appeal has been received, and more than 20 days have passed since the OIP received ICB's appeal.

e.   On August 16, 2013, FBI responded via a letter assigning number 1222321-0 to the FBI Disciplinary Action Request as it relates to Fayiz Mohammed Ahmed Al Kandari.

f.   On August 20, 2013, FBI responded with a letter denying the FBI Disciplinary Request, request number 1222321-0.  FBI stated it did not locate any responsive documents after searches in the indices to FBI's Central Records System.  In the same letter, FBI stated it could neither confirm nor deny the existence of Fayiz Mohammed Ahmed Al Kandari on any watch lists under FOIA Exemption 7(e) and Privacy Act Exemption (j)(2).

g.   On September 10, 2013 ICB submitted its appeal of the FBI's denial to the OIP, arguing that the FBI did not perform an adequate search, and requesting that an adequate search be performed.

h.   On September 17, 2013, the OIP received ICB's appeal of the FBI's denial,

i.   At this time, no response to this appeal has been received, and more than 20 days have passed since the OIP received ICB's appeal.

76.   In May of 2013, ICB submitted a set of FOIA requests related specifically to the PRBs established by Executive Order 13567, the Special Interagency Task Force on Detainee Disposition established by Executive Order 13493, and the Special Interagency Task Force on

23

Interrogation and Transfer Policies established by Executive Order 13491 ("PRB and Task Force

Request") to various Defendants, seeking the following records:

> "1.    Any and all records, created on or after March 7, 2011
> relating to or reflecting the U.S. Government's planning for,
> policies for, communications relating to, and decisions,
> actions, or reviews of the Periodic Review Board, established
> by Executive Order 13567 on March 7, 2011.  This request
> includes, but is not limited to, any document related to: (a) the
> commencement of hearing(s) conducted by the Periodic Review
> Board as part of the initial review of any detainee; (b) any full
> review of any detainee conducted by the Periodic Review
> Board; (c) any file review of any detainee conducted by the
> Periodic Review Board; (d) the establishment of and any
> policies and procedures for the Periodic Review Secretariat;
> (e) the establishment of and any policies and procedures for
> the Analytic Task Force, as the term is used in Directive-Type
> Memorandum (DTM) 12-005, dated May 9, 2012.
>
> 2.    Any document, created on or after May 8, 2009,
> relating to or reflecting the decisions, actions, or reviews of the
> Special Interagency Task Force on Detainee Disposition,
> established by Executive Order 13493 on January 22, 2009, or
> the Special Interagency Task Force on Interrogation and
> Transfer Policies, established by Executive Order 13491 on
> January 22, 2009."

77.    The PRB and Task Force Request was sent to DoD on May 21, 2013.

   a.    On June 9, 2013, DoD responded via an email from D. Nichelson assigning

   number 13-F-0898 to the DoD PRB and Task Force Request, and stating that

   DoD would be unable to respond to the DoD PRB and Task Force Request within

   the 20-day statutory period.

   b.    No further response has been received from DoD regarding the DoD PRB and

   Task Force Request

78.    The PRB and Task Force Request was sent to DoJ on May 21, 2013.

   a.    On June 6, 2013, DoJ responded via a letter from R. Wilson stating that the DoJ

   PRB and Task Force Request had been referred to DOJ components.

24

b.  On June 10, 2013, the BOP responded via a letter assigning number 2013-08557 to the DoJ PRB and Task Force Request.

c.  On June 27, 2013, the National Security Division responded via a letter from A. Mallory assigning number 13-195 to the DoJ PRB and Task Force Request.

d.  No further response has been received from DoJ or its components regarding the DoJ PRB and Task Force Request.

79.  The PRB and Task Force Request was sent to DoS on May 21, 2013.

a.  On June 11, 2013, DoS responded via a letter from M. Casto assigning number F-2013-09453 to the DoS PRB and Task Force Request.

b.  No further response has been received from DoS regarding the DoS PRB and Task Force Request.

80.  In May of 2013, ICB submitted a set of FOIA requests related specifically to the continued detention of detainees at Guantanamo Bay ("Detention Request") to various Defendants, seeking the following records:

> "1.  Any and all records relating to or reflecting the United States Government's ("USG") planning for, policies for, communications relating to, and decisions, actions, or reviews regarding the continued law of war detention of detainees at the U.S. Navy Base, Guantanamo Bay, Cuba ("Guantanamo"). This includes any document related to or reflecting the possibility of continued or indefinite law of war detention, including but not limited to until their deaths, of any detainee.
>
> 2.  Any and all records relating to or reflecting the USG's policies for, analyses of, and decisions, actions, or reviews regarding the meaning of the phrase "persons [the President] determines planned, authorized, committed, or aided the terrorist attacks" as used in the Authorization for the Use of Military Force, Pub. Law 107-40, 115 Stat. 224 (2001).
>
> 3.  Any and all records relating to or reflecting the USG's policies for, analyses of, and decisions, actions, or reviews regarding the meaning of the phrase "associated forces" as

*used in the Department of Justice Memorandum Regarding the
Government's Detention Authority Relative to Detainees Held
at Guantanamo Bay, dated March 13, 2009, available at
http://www.justice.gov/opa/documents/memo-re-det-auth.pdf."*

81.    The Detention Request was sent to DoD on May 21, 2013.

    a.    On June 9, 2013, DoD responded via an email from D. Nichelson assigning
number 13-F-0899 to the DoD Detention Request, and stating that DoD would be
unable to respond to the DoD Detention Request within the 20-day statutory
period.

    b.    On June 14, 2013, DoD responded via a letter from P. Jacobsmeyer, stating that
the DoD Detention Request had been referred to USSOUTHCOM for processing
and direct response to ICB.  The letter informed ICB that DoD is continuing to
process the Request.

    c.    No further response has been received from DoD or its components regarding the
DoD Detention Request.

82.    The Detention Request was sent to CIA on May 21, 2013.

    a.    On July 11, 2013, CIA responded via a letter from M. Meeks assigning number F-
2013-01818 to the CIA Detention Request, and stating that ICB should direct item
2 of the request to DoD.  In this same letter, CIA also informed ICB that it was
unlikely CIA would be able to respond to the CIA Detention Request within the
20-day statutory period.

    b.    No further response has been received from CIA or its components regarding the
CIA Detention Request.

83.    The Detention Request was sent to DoJ on May 21, 2013.

    a.    On June 6, 2013, DoJ responded via a letter from R. Wilson stating that the Request had been referred to DoJ components.

    b.    On June 27, 2013, the National Security Division responded via a letter from A. Mallory assigning number 13-194 to the DoJ Detention Request.

    c.    No further response has been received from DoJ or its components regarding the DoJ Disciplinary Action Request.

84.    The Detention Request was sent to DoS on May 21, 2013.

    a.    On June 11, 2013, DoS responded via a letter from M. Casto assigning number F-2013-09454 to the DoS Detention Request.

    b.    No further response has been received from DoS regarding the DoS Detention Request.

85.    On May 21, 2013, ICB submitted a letter to DoD containing a FOIA request for the following documents related to certain imagery of the Kuwaiti Detainees ("DoD Imagery Request"):

> *"Any and all still images, including any photograph or picture, created on or after March 12, 2008, which depict or reflect the image, likeness, or any other aspect or activity, of Fayiz Mohammed Ahmed Al Kandari or Fawzi Khaled Abdullah Fahad Al Odah.  This request includes, but is not limited to, images associated with, relating to or depicting any disciplinary action or medical treatment performed on Fayiz Mohammed Ahmed Al Kandari or Fawzi Khaled Abdullah Fahad Al Odah (with or without their consent) as a result of any previous or current hunger strike."*

    a.    On June 9, 2013, DoD responded via an email from D. Nichelson assigning number 13-F-0900 to the DoD Imagery Request, and stating that DoD would be unable to respond to the DoD Imagery Request within the 20-day statutory period.

b.  On June 14, 2013, DoD responded via a letter from P. Jacobsmeyer, stating that the Imagery Request had been referred to USSOUTHCOM for processing and direct response to ICB.  The letter informed ICB that DoD is continuing to process the Request.

c.  No further response has been received from DoD or its components regarding the DoD Imagery Request.

86.    On May 21, 2013, ICB submitted a letter to DoD containing a FOIA request for the following documents related to hunger strikes by detainees at Guantanamo Bay ("DoD Hunger Strikes Request"):

> *"1.     Any and all records created on or after January 1, 2009, relating to or reflecting hunger strikes by detainees at the U.S. Navy Base, Guantanamo Bay, Cuba ("Guantanamo").*
>
> *2.     Any and all records created on or after January 1, 2009, relating to or reflecting any policies or procedures concerning, establishing and/or conducting at Guantanamo, the involuntary enteral feeding of detainees, as the term is used in Department of Defense ("DoD") Standard Operating Procedures.  This request includes, but is not limited to, any record relating to or reflecting any instructions given by the United States Government ("USG") to medical and security personnel who have previously responded, or are currently responding, to hunger strikes by detainees.*
>
> *3.     Any and all records created on or after January 1, 2009, related to, or reflecting the number of, medical and security personnel who have previously responded, or are currently responding, to hunger strikes by detainees at Guantanamo.  This request includes, but is not limited to, any record related to or reflecting (a) the assignment by the USG of medical personnel to Guantanamo to respond to any previous or current hunger strikes by detainees; and (b) the medical specialties of any medical personnel who have previously responded, or are currently responding, to hunger strikes by detainees at Guantanamo.*
>
> *4.     Any and all records created on or after May 8, 2009, related to "Code Yellow" or any other "Code" incidents at*

> *Guantanamo. This request includes, but is not limited to, (a) any document relating to or reflecting the criteria for implementing a "Code Yellow" or any other "Code"; (b) any document relating to or reflecting the procedures for executing a "Code Yellow" or any other "Code"; and (c) any records, including any image, photograph, picture or other imagery, relating to or reflecting responses by the USG to "Code Yellow" or any other "Code" incidents."*

    a.    On June 9, 2013, DoD responded via an email from D. Nichelson assigning number 13-F-0897 to the DoD Hunger Strike Request, and stating that DoD would be unable to respond to the DoD Hunger Strike Request within the 20-day statutory period.

    b.    No further response has been received from DoD regarding the DoD Hunger Strike Request.

87.    At this time, none of the Defendants has provided any documents to ICB in response to any of the FOIA Requests described above. With respect to the requests sent to DoD, CIA, DoJ, DoS and FBI, the statutory period for a determination has expired. *See* 5 U.S.C. § 552(a)(6)(A)(i). With respect to the administrative appeals of the Disciplinary Request sent to the Criminal Division and the FBI, the statutory period of response to the appeals has expired, and ICB has not received a determination of its appeals. *See id.* § 552(a)(6)(A)(ii). ICB has thus exhausted its administrative remedies.

88.    Each and every FOIA request submitted to each and every Defendant in this matter relates directly to a subject of significant public interest.

### VI.    <u>CAUSES OF ACTION</u>

#### <u>First Cause of Action:</u>

<u>Violation of FOIA for Failure to Make Promptly Available
the Records Sought by the Requests</u>

89.    ICB incorporates by reference and realleges paragraphs 1-88.

90.     Defendants' failure to make promptly available the records sought by the properly submitted FOIA Requests violates FOIA, 5 U.S.C. § 552(a)(3)(A).

### Second Cause of Action:

### Violation of FOIA for Failure to Timely Respond to the Requests

91.     ICB incorporates by reference and realleges paragraphs 1-88.

92.     Defendants' failure to timely respond to the Requests violates FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and Defendants' own regulations promulgated thereunder.

## VII.   REQUESTED RELIEF

WHEREFORE, ICB prays that this Court:

a)      ORDER Defendants to immediately process the Requests they have received, and to disclose fully legible copies of the records requested;

b)      EXPEDITE this proceeding as provided for in 28 U.S.C. § 1657;

c)      SET a schedule for producing requested records to ICB;

d)      AWARD ICB its costs and reasonable attorneys' fees incurred in this action; and

e)      GRANT such other relief as the Court may deem just and proper.

Respectfully submitted,

ARNOLD & PORTER LLP

By:
Ronald A. Schechter (D.C. Bar No. 245019)
Ronald D. Lee (D.C. Bar No. 411516)
Stuart Turner (D.C. Bar No. 478392)
Emma V. Broomfield (D.C. Bar No. 988927)
555 12th Street, N.W.
Washington, D.C.  20004
Tel: (202) 942-5000

30

Fax: (202) 942-5999
Email: ronald.schechter@aporter.com
     ronald.lee@aporter.com
     stuart.turner@aporter.com
     emma.broomfield@aporter.com