## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

INTERNATIONAL COUNSEL BUREAU,  )
  )
      Plaintiff,  )
  )
    v.  )     Civil Action No. 13-01591 (JDB)
  )
UNITED STATES DEPARTMENT  )
OF DEFENSE *et al.,*  )
  )
      Defendants.  )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION
## FOR SUMMARY JUDGMENT

Plaintiff International Counsel Bureau ("ICB") respectfully requests (1) that the Court deny

Defendant Federal Bureau of Investigation's ("FBI" or the "Agency") Motion for Summary

Judgment; and (2) that the Court grant this Cross-Motion for Summary Judgment.  ICB also requests

Oral Argument on this Motion.

The parties' cross-motions relate to a Freedom of Information Act ("FOIA") request that ICB

submitted to the FBI on behalf of two Kuwaiti citizens who are presently detained in the U.S.

military prison at Guantanamo Bay, Cuba (the "Disciplinary Action Request").

As described in the attached Memorandum of Points and Authorities, the FBI has failed to

meet its burden to establish that it conducted an adequate search for records responsive to the

Request.  Further, the FBI has not provided adequate justification for its exemption claims.  The

Court should deny the FBI's Motion and grant ICB's Cross-Motion for Summary Judgment,

directing the FBI to perform an adequate search for records responsive to the Request, and

compelling immediate production of all documents responsive to the Request.  A proposed order is attached.

Date:   October 15, 2014                          Respectfully submitted,

                                                  /s/  Ronald A. Schechter
                                                  Ronald A. Schechter, D.C. Bar # 245019
                                                  Ronald D. Lee, D.C. Bar # 411516
                                                  Stuart W. Turner, D.C. Bar # 478392
                                                  Emma V. Broomfield, D.C. Bar # 988927
                                                  Dana E. Peterson, D.C. Bar # 1006952
                                                  ARNOLD & PORTER LLP
                                                  555 12th Street, NW
                                                  Washington, DC 20004
                                                  (202) 942 5000
                                                  ronald.schechter@aporter.com
                                                  ronald.lee@aporter.com
                                                  stuart.turner@aporter.com
                                                  emma.broomfield@aporter.com
                                                  dana.peterson@aporter.com

                                                  *Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| INTERNATIONAL COUNSEL BUREAU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-01591 (JDB) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF DEFENSE *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ......................................................................................................... 1

II.    STATEMENT OF THE CASE ...................................................................................... 2

III.   STANDARD OF REVIEW ........................................................................................... 4

IV.   THE FBI HAS NOT MET ITS OBLIGATION TO CONDUCT AN ADEQUATE
      SEARCH FOR RESPONSIVE RECORDS AS RELATED TO AL KANDARI ............... 6

   A.   The FBI Has Not Proven That Its Search Was Adequate, And The FBI's Motion For
       Summary Judgment On This Point Should Be Denied..................................................... 6

   B.   The Argall Declaration Raises Material Questions As To The Sufficiency Of The
       Search Methodology. .................................................................................................. 7

     1.   The FBI Provided an Inadequate Description of its Records Systems. ...................... 9

     2.   The FBI's Search is Rendered Inadequate by the FBI's Prior Productions to ICB.... 12

     3.   The FBI Improperly Limited the Scope of its Search.............................................. 13

     4.   The FBI Failed to Use Adequate Search Terms. ................................................... 14

V.    THE FBI'S CATEGORICAL WITHHOLDING OF RECORDS RELATED TO AL
      ODAH WAS IMPROPER ............................................................................................ 17

   A.   ICB Exhausted Its Administrative Remedies For The Disciplinary Action Request. ... 18

   B.   The FBI Fails To Establish That The Requested Documents Qualify As "Law
       Enforcement" Records Under Exemption 7(c). .......................................................... 20

   C.   The *De Minimis* Privacy Considerations Do Not Outweigh The Strong Public Interest In
       Disclosure Of Records Responsive To The Disciplinary Action Request. ................... 23

     1.   The FBI Fails to Establish a Substantial Privacy Interest in Records Related to Al
       Odah......................................................................................................................... 25

     2.   The Public Interest in Disclosure is Significant and Requires that the FBI Process
       ICB's Disciplinary Action Request. ....................................................................... 30

VI.   CONCLUSION ........................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

Cases[1]

*American Civil Liberties Union v. U.S. Department of Justice,*
    655 F.3d 1 (D.C. Cir. 2011) ............................................................24, 31

*Ancient Coin Collectors Guild v. U.S. Department of State,*
    641 F.3d 504 (D.C. Cir. 2011) ..............................................................11

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................4

*\*Bartko v. U.S. Department of Justice,*
    --- F.Supp.2d ----, 2014 WL 3834343 (D.D.C. Aug. 5, 2014) ....................24, 35, 36

*Beck v. U.S. Department of Justice,*
    997 F.2d 1489 (D.C. Cir. 1993) ............................................................24

*Blackwell v. F.B.I.,*
    680 F. Supp. 2d 79 (D.D.C. 2010), *aff'd,* 646 F.3d 37 (D.C. Cir. 2011) ............8, 14

*Braga v. F.B.I.,*
    910 F. Supp. 2d 258 (D.D.C. 2012) ......................................................24

*Calvert v. United States,*
    662 F. Supp. 2d 27 (D.D.C. 2009) ........................................................19

*Campbell v. U.S. Department of Justice,*
    164 F.3d 20 (D.C. Cir. 1998) ...........................................................20, 21

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................4

*Church of Scientology v. Internal Revenue Service,*
    792 F.2d 146 (D.C. Cir. 1986), *aff'd* 484 U.S. 9 (1987) .............................9

*\*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice,*
    746 F.3d 1082 (D.C. Cir. 2014) .....................................................4, 28, 32

*\*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice,*
    840 F. Supp. 2d 226 (D.D.C. 2012) ................................................... passim

*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice,*
    846 F. Supp. 2d 63 (D.D.C. 2012) ........................................................23

---

[1] * Asterisks indicate cases upon which ICB chiefly relies.

*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice*,
   978 F. Supp. 2d 1 (D.D.C. 2013) ......................................................................5, 6

*Dhiab v. Obama*,
   Civ No. 05-1457 (GK) (Oct. 2, 3, 2014) .........................................................33, 34

*El Badrawi v. Department of Homeland Security*,
   583 F. Supp. 2d 285 (D. Conn. 2008) ..............................................................9, 10

*Farmworkers Legal Services of North Carolina, Inc. v. U.S. Department of Labor*,
   639 F. Supp. 1368 (E.D.N.C. 1986) ......................................................................6

*Founding Church of Scientology of Washington D.C., Inc. v. National Security Agency*,
   610 F.2d 824 (D.C. Cir. 1979) ...............................................................................8

*Gilman v. U.S. Department of Homeland Security*,
   2014 WL 984309 (D.D.C. Mar. 14, 2014) .............................................................35

*Halpern v. F.B.I.*,
   181 F.3d 279 (2d Cir. 1999) ..................................................................................5

*Houghton v. U.S. Department of State*,
   875 F. Supp. 2d 22 (D.D.C. 2012) ........................................................................11

*In re Guantanamo Bay Litigation*,
   624 F. Supp. 2d 27 (D.D.C. 2009) ........................................................................33

*International Counsel Bureau v. U.S. Department of Defense*,
   723 F. Supp. 2d 54 (D.D.C. 2010) ........................................................................33

*International Counsel Bureau v. U.S. Department of Defense*,
   864 F. Supp. 2d 101 (D.D.C. 2012) ......................................................................16

*International Counsel Bureau v. U.S. Department of Defense*,
   657 F. Supp. 2d 33 (D.D.C. 2009) ..........................................................................7

*Jefferson v. Department of Justice, Office of Professional Responsibility*,
   284 F.3d 172 (D.C. Cir. 2002) ..................................................................20, 21, 22

*Larson v. Department of State*,
   2005 WL 3276303 (D.D.C. Aug. 10, 2005) .............................................................8

*Los Angeles Times Commcunications LLC v. U.S. Department of Labor*,
   483 F. Supp. 2d 975 (C.D. Cal. 2007) ...................................................................25

*Morley v. C.I.A.*,
   508 F.3d 1108 (D.C. Cir. 2007) ..........................................................................5, 7

*Multi Ag Media LLC v. Department of Agriculture,*
  515 F.3d 1224 (D.C. Cir. 2008) ........................................................26

*National Association of Retired Federal Employees v. Horner,*
  879 F.2d 873 (D.C. Cir. 1989) ..........................................................32

*National Immigration Project of the National Lawyers Guild v. U.S. Departmentt of*
  *Homeland Security,*
  2012 WL 6809301 (S.D.N.Y. Dec. 27, 2012) ..............................................11, 13

*\*Nation Magazine, Washington Bureau v. U.S. Customs Service,*
  71 F.3d 885 (D.C. Cir. 1995) ....................................................... passim

*Negley v. F.B.I.,*
  658 F. Supp. 2d 50 (D.D.C. 2009) ......................................................16

*Oglesby v. U.S. Department of Army,*
  920 F.2d 57 (D.C. Cir. 1990) ..........................................................7, 8

*Parker v. U.S. Department of Justice Executive Office for U.S. Attorneys,*
  852 F. Supp. 2d 1 (D.D.C. 2012) ......................................................5, 21

*Pratt v. Webster,*
  673 F.2d 408 (D.C. Cir. 1982) ..........................................................20

*Rosenberg v. U.S. Department of Immigration & Customs Enforcement,*
  959 F. Supp. 2d 61 (D.D.C. 2013) ....................................................13, 17

*Schoenman v. F.B.I.,*
  575 F. Supp. 2d 136 (D.D.C. 2008) .......................................................8

*Shapiro v. Department of Justice,*
  --- F.Supp. 2d ---, 2014 WL 953270 (D.D.C. March 12, 2014) ............................21

*Steinberg v. U.S. Department of Justice,*
  23 F.3d 548 (D.C. Cir. 1994) .......................................................5, 6, 10

*U.S. Department of Defense v. Federal Labor Relations Authority,*
  510 U.S. 487 (1994) ....................................................................24

*U.S. Department of Justice v. Reporters Committee for Freedom of Press,*
  489 U.S. 749 (1989) ....................................................................31

*U.S. Department of State v. Ray,*
  502 U.S. 164 (1991) ....................................................................24

*United America Financial, Inc. v. Potter,*
  531 F. Supp. 2d 29 (D.D.C. 2008) ........................................................5

*Vymetalik v. F.B.I.,*
    785 F.2d 1090 (D.C. Cir. 1986) ............................................................................20

*Wiggins v. National Credit Union Administration*,
    2007 WL 259941 (D.D.C. Jan. 30, 2007) ..........................................................26

## STATUTES

5 U.S.C. § 552(a)(4)(B) .........................................................................................5

5 U.S.C. § 552(b)(6) .......................................................................................20, 23

5 U.S.C. § 552(b)(7)(c) ..................................................................................20, 23

28 C.F.R. § 16.1 ...................................................................................................19

28 C.F.R. § 16.3 ...................................................................................................19

Fed. R. Civ. P. 56(c) ..............................................................................................4

## OTHER AUTHORITIES

al-Alwi, Moath, *Guantanamo Inmate: 'We Will Remain on Hunger Strike,' Al Jazeera*
    *America, Oct. 15, 2013, available at*
    *http://america.aljazeera.com/articles/2013/10/15/hunger-strike-guantanamo.html.*..............34

Associated Press, *Military Updates on Guantanamo Hunger Strikes to End*, USA TODAY,
    Sept. 23, 2013, *available at*
    http://www.usatoday.com/story/news/nation/2013/09/23/us-military-ending-gitmo-
    hunger-strike-updates/2857273/ ..........................................................................34

Barclay, Eliza and Naudziunas, Jessica, *Why Doctors Oppose Force-Feeding*
    *Guantanamo Hunger Strikes*, NPR, July 11, 2013, *available at*
    http://www.npr.org/blogs/thesalt/2013/07/10/200751527/why-doctors-oppose-force-
    feeding-guantanamo-hunger-strikers ....................................................................35

Carter, Chelsea J. and Liptak, Kevin, *Doctors to Obama: Let Us Treat Hunger-Striking*
    *Detainees at Guantanamo*, CNN, June 19, 2013, *available at*
    http://www.cnn.com/2013/06/18/health/guantanamo-hunger-strike/ ....................................34

*Court Ruling for Detainee Reignites Legal, Political Debate About Releasing Gitmo*
    *Detainees*, FOXNEWS, *available at*
    http://www.foxnews.com/politics/2014/08/17/court-ruling-for-detainee-reignites-
    legal-political-debate-about-gitmo-closing/..........................................................28

Fenton, Jennifer, *Kuwaiti Families in Legal Limbo at Guantanamo*, AL JAZEERA, Dec.
    29, 2011, *available at*
    http://www.aljazeera.com/indepth/features/2011/12/201112298544422981.html.................28

Fenton, Jenifer, *Indefinite Wait Continues for Kuwaiti Father of Gitmo Detainee*, AL
   JAZEERA AMERICA, June 5, 2014, *available at*
   http://america.aljazeera.com/articles/2014/6/5/indefinite-wait-gitmofather.html. .................28

Guantanamo Detainee Profile, March 19, 2014, *available at*
   http://www.prs.mil/ReviewInformation/FullReviewpage.aspx. .............................................26

Guantanamo Review Task Force, Final Report, (Jan. 22, 2010).....................................................30

Mayer, Jane, The Dark Side (2009) .................................................................................................29

Nakashima, Ellen, *FBI Shows Off Counterterrorism Database*, THE WASHINGTON POST,
   Aug. 30, 2006, *available at* http://www.washingtonpost.com/wp-
   dyn/content/article/2006/08/29/AR2006082901520.html. .....................................................14

*One of Five 9/11 Accused to be Tried Separately*, AGENCE FRANCE-PRESSE, July 25,
   2014, *available at* http://news.yahoo.com/one-five-9-11-accused-tried-separately-
   225816764.html. ......................................................................................................................27

Phelps, Timothy, *Kuwaiti Fawzi Odah Wins Approval for Release From Guantanamo
   Prison*, July 25, 2014, L.A. TIMES, *available at*
   http://www.latimes.com/nation/nationnow/la-na-nn-kuwaiti-guantanamo-release-
   20140725-story.html. ..............................................................................................................27

*Pillay Says Guantanamo Detention Regime is in "Clear Breach of International Law"
   and Should be Closed*, U.N. HUMAN RIGHTS (April 5, 2013),
   http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=13212&L
   angID=E.................................................................................................................................35

Press Release, Center for Constitutional Right, Rights Groups Release Documents
   Obtained in FOIA Case Relating to Secret Detention, Extraordinary Rendition, and
   Torture Program (Feb. 12, 2009), *available at*
   http://www.ccrjustice.org/newsroom/press-releases/rights-groups-release-documents-
   obtained-foia-case-relating-secret-detention..........................................................................29

Rosenberg, Carol, *FOIA Suit Reveals Guantanamo's 'Indefinite Detainees,'* MIAMI
   HERALD, June 17, 2013, *available at* http://www.miamiherald.com/news/nation-
   world/world/americas/article1952557.html. ...........................................................................35

Shafey, Mohammad, *Experiencing Obesity at Camp V*, CAGEPRISONERS (March 9, 2006)
   *available at* http://old.cageprisoners.com/articles.php?id=16151. .........................................29

Unclassified Summary of Final Determination, July 14, 2014, *available at*
   http://www.prs.mil/ReviewInformation/FullReviewpage.aspx. .............................................27

*US clears Kuwaiti for Release From Guantanamo*, ASSOCIATED PRESS, Jul. 25, 2014,
   *available at* http://bigstory.ap.org/article/us-clears-kuwaiti-release-guantanamo..................27

## I.      INTRODUCTION

Plaintiff ICB filed suit against the FBI[1] seeking to require the Agency to process the FOIA request ICB submitted to the FBI for records related to Fayiz Mohammed Ahmed Al Kandari and Fawzi Khaled Abdullah Fahad Al Odah, two Kuwaiti citizens who are presently detained in the U.S. military prison at Guantanamo Bay, Cuba ("Guantanamo"), and to release any documents responsive to ICB's FOIA request.   ICB's FOIA request, the Disciplinary Action Request, sought records relating to or reflecting any alleged breaches or violations by either Al Kandari or Al Odah of any governing rules of discipline or behavior, as well as records relating to or reflecting any investigations into alleged abuse of mistreatment of either prisoner.

In seeking summary judgment for its disposition of the Disciplinary Action Request, the FBI contends it performed an adequate search for records related to Al Kandari and found no responsive records.   With regard to records related to Al Odah, the FBI asserts a so-called "*Glomar* response," by which it declines to confirm or deny the existence of records in its possession, citing the privacy interests of third-parties in not being associated with the Agency's files.   The FBI bases its response on its policy of "denying requests that seek information related to third-parties where the request lacks a privacy waiver, a proof of death, or a convincing showing that the public interest in disclosure outweighs any privacy considerations."   (FBI Mot. at 8.)   The FBI asserts that acknowledging the existence or nonexistence of the requested records is itself an invasion of privacy, as "individuals have a strong interest in not being associated unwarrantedly with alleged criminal activity."   (*Id.* at 9.)

The FBI has failed, both procedurally and substantively, to justify its responses to ICB's Disciplinary Action Request.   First, the FBI has failed to show that it performed an adequate

---

[1] ICB included other federal agencies as defendants in the case, but they are not relevant to the present Motion and Cross-Motion.

search for records related to Al Kandari.   The Declaration of Dennis J. Argall ("Argall Declaration") is woefully insufficient to support its summary judgment motion.   Among other problems, the Argall Declaration contains confusing, and inadequate, information regarding the FBI's system of records, and does not explain why the FBI conducted only an automated search for documents.   Nor does the FBI sufficiently justify its actions in searching only one record system and in limiting its search terms.   The stark contrast between the FBI's meager production in response to the Disciplinary Action Request here and its productions to ICB in response to previous requests casts significant doubt on the adequacy of the FBI's search in this case. Notably, the FBI has previously produced numerous email records to ICB, yet now claims that no responsive emails exist.

Second, the FBI's Motion and supporting declaration do not justify its blanket *Glomar* response with regard to records related to Al Odah.   The Agency mischaracterizes and misapplies the relevant standard for application of Exemptions 6 and 7(c).   Al Odah has already been associated with the FBI's law enforcement activities at Guantanamo and with the broader allegations of serious wrongdoing publicly leveled against all the Guantanamo detainees; disclosure therefore presents no additional harm to Al Odah's privacy.   Further, the FBI is incorrect that the only cognizable public interest for the purposes of Exemptions 6 and 7(c) is in revealing information about an agency's wrongdoing.   The Agency has failed to justify its refusal to process ICB's request for records related to Al Odah.

## II.    STATEMENT OF THE CASE

This action arises from ICB's Disciplinary Action Request, filed under FOIA on May 21, 2013, seeking records related to or reflecting any alleged breaches or violations by either Al Kandari or Al Odah of any governing rules of discipline or behavior, as well as records relating to or reflecting any investigations into alleged abuse of mistreatment of either prisoner.   Although ICB

submitted a single request seeking documents related to both detainees, the FBI assigned two separate administrative tracking numbers to the Request, one for documents related to Al Kandari, and one for documents related to Al Odah.

For Al Kandari, the FBI stated it "has taken the position" that the privacy waivers ICB previously submitted to the FBI for Al Kandari in connection with FOIA requests for disciplinary records "remain[] in effect" for ICB's current Disciplinary Action Request.  (FBI Mot. at 3, n. 1.) On August 20, 2013, the FBI denied ICB's Request as to Al Kandari, informing ICB it did not locate any responsive documents after searches in the indices to the FBI's Central Records System ("CRS").  ICB submitted its appeal of the FBI's response to the Office of Information Policy ("OIP") on September 10, 2013, arguing that the FBI did not perform an adequate search. ICB requested that OIP direct the FBI to conduct an adequate search for records responsive to the ICB Request.  OIP acknowledged receipt of this appeal on October 22, 2013.  OIP subsequently informed ICB that OIP was closing the appeal due to ICB's filing of the instant action.

For Al Odah, the FBI informed ICB by letter dated August 16, 2013 that, because the Request concerned a third party, the FBI required one of the following to continue processing: (1) an authorization and consent from the individual; (2) proof of death; or (3) justification that the public interest in disclosure outweighs personal privacy interests.  The FBI also informed ICB that, absent this information, the FBI could neither confirm nor deny the existence of any records responsive to this Request, which, if they were to exist, would be exempt from disclosure pursuant to FOIA Exemptions 6 and 7(c).  The FBI also informed ICB of its administrative appeal rights.  On September 10, 2013, ICB responded to the FBI's letter and request for information by filing a submission with OIP.  ICB explained that the overriding public interest in

disclosure of records responsive to the Disciplinary Action Request outweighs any potential personal privacy interest, and requested that an adequate search be performed.  Although OIP acknowledged ICB's submission on October 22, 2013, neither OIP nor the FBI, to date, has provided a response.

ICB filed this instant action against various federal agencies seeking, in part, an order that the FBI process the Disciplinary Action Request.  Pursuant to this Court's January 13, 2014 Scheduling Order and the agreement of the parties, the FBI agreed to complete processing of ICB's Disciplinary Action Request by July 15, 2014.  To date, the FBI has not released any records responsive to ICB's Request.  In accordance with the Court's Order, the FBI subsequently filed its Motion for Summary Judgment on September 15, 2014.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate only when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of proving an absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 317-22 (1986), and the court must draw all reasonable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

To obtain summary judgment in a FOIA case, the government has the burden of proving that its search was adequate and that any withheld documents fall within a claimed FOIA exemption.  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).  A court must narrowly construe the exemptions, and therefore "conclusory and generalized allegations of exemptions are unacceptable."  *Morley v. C.I.A.*, 508 F.3d 1108, 1115 (D.C. Cir. 2007).

In considering summary judgment, agency affidavits are accorded a "presumption of good faith." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 978 F. Supp. 2d 1, 6 (D.D.C. 2013) (*quoting Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 54 (D.D.C. 2006)).  However, such declarations are sufficient for summary judgment purposes only when they "describe the documents and the justification for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *United Am. Fin., Inc. v. Potter*, 531 F. Supp. 2d 29, 38 (D.D.C. 2008) (*quoting Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  Furthermore, the declaration must provide evidence sufficient to establish that the agency "has conducted a 'search reasonably calculated to uncover all relevant documents.'"  *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (*quoting Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

To demonstrate that its *Glomar* response to the Disciplinary Record Request for Al Odah is applicable to the instant facts, the FBI must show why "revealing the existence of documents related to a disciplinary investigation" of Al Odah "constitute[s] an 'invasion of personal privacy' under either Exemption 6 or 7(c)."  *Parker v. U.S. Dep't of Justice Exec. Office for U.S. Attorneys*, 852 F. Supp. 2d 1, 11 (D.D.C. 2012).

FOIA states that the district court reviews agency decisions to withhold records de novo. 5 U.S.C. § 552(a)(4)(B); *Halpern v. F.B.I.*, 181 F.3d 279, 288 (2d Cir. 1999).  "If an agency improperly withholds any documents, the district court has jurisdiction to order their production."  *Citizens for Responsibility & Ethics in Wash.*, 978 F. Supp. at 6 (*quoting U.S. Dep't of Justice  v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989)).

## IV.    THE FBI HAS NOT MET ITS OBLIGATION TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS AS RELATED TO AL KANDARI

The Argall Declaration discloses the defective scope and inadequate method of the FBI's search for responsive documents.   The Court should deny the FBI's Motion for Summary Judgment on the issue of adequacy of the search, grant ICB's Cross-Motion for Summary Judgment on this issue, and order the FBI to conduct a search for records responsive to ICB's Request.

### A.    The FBI Has Not Proven That Its Search Was Adequate, And The FBI's Motion For Summary Judgment On This Point Should Be Denied.

By failing to sufficiently describe the scope of its search, and by improperly limiting the databases in which the FBI conducted its search, the manner in which the FBI conducted its search, and the terms that the FBI utilized during this search, the FBI has failed to sustain its burden of proving that it "has conducted a 'search reasonably calculated to uncover all relevant documents.'"  *Steinberg*, 23 F.3d at 551 (*quoting Weisberg*, 745 F.2d at 1485).

As an initial matter, the FBI contends that the Argall Declaration purportedly "overcomes" the concerns ICB raised in its administrative appeal relating to the FBI's failure to explain how it selected the CRS as the system to be searched and to the FBI's failure to state whether it conducted searches using alternate spellings of Al Kandari's name.   Thus, the FBI asserts that it has met its obligation to conduct an adequate search under FOIA.   (FBI Mot. at 7-8.)   To the extent the FBI is suggesting that ICB is precluded from raising any *additional* adequacy concerns not present in its administrative appeal, the FBI's position is without merit. The FBI's position ignores that, in a FOIA action, the "district court is not limited to review of the quality of agency decision making. It decides a claim *de novo*."  *Farmworkers Legal Servs. of N.C., Inc. v. U.S. Dep't of Labor*, 639 F. Supp. 1368, 1371 (E.D.N.C. 1986).   Furthermore, while ICB challenged the adequacy of the FBI's search on administrative appeal and therefore

administratively exhausted this issue, ICB could not have raised arguments specific to the facts

of the FBI's search unknown at the time of appeal.  Indeed, the FBI's denial letter indicated only

that it had searched the "indices to our Central Records Systems," but did not list the search

terms utilized or otherwise provide any specifics regarding the FBI's limited, flawed search.

(Decl. Argall, Ex. C.)  Accordingly, ICB is not limited to challenging the adequacy of the FBI's

search based solely on the reasons set forth in its administrative appeal.

> **B.     The Argall Declaration Raises Material Questions As To The Sufficiency Of The Search Methodology.**

The FBI's conclusory, and confusing, statements on the scope of its search render

summary judgment for the FBI inappropriate.  "The court applies a 'reasonableness' test to

determine the 'adequacy' of a search methodology, consistent with congressional intent tilting

the scale in favor of disclosure."  *Morley*, 508 F.3d at 1114 (*quoting Campbell v. U.S. Dep't of

Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998)).  To comply with its FOIA obligations, an agency

"must show that it made a good faith effort to conduct a search for the requested records, using

methods which can be reasonably expected to produce the information requested."  *Oglesby v.

U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (remanding to determine adequacy of

search because defendant did not identify all records it searched).  In addition, as this Court held

in *International Counsel Bureau v. U.S. Department of Defense*, 657 F. Supp. 2d 33 (D.D.C.

2009), an agency is required to "describe at least generally the structure of its file system" to

ensure that it has searched all appropriate systems of records.  *Id.* at 38, 41 (*quoting Church of

Scientology v. Internal Revenue Serv.*, 792 F.2d 146, 150-51 (D.C. Cir. 1986), *aff'd* 484 U.S. 9

(1987)).  Although "[t]here is no requirement that an agency search every record system, . . . the

agency must conduct a good faith, reasonable search of those systems of records likely to possess

the requested information." *Blackwell v. F.B.I.*, 680 F. Supp. 2d 79, 90 (D.D.C. 2010), *aff'd*, 646 F.3d 37 (D.C. Cir. 2011).

An agency can make this showing be submitting "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive material (if such records exist) were searched." *Oglesby,* 920 F.2d at 68. A court's reliance on government affidavits is appropriate, however, only when the affidavits are "relatively detailed and non-conclusory, and . . . submitted in good faith." *Schoenman v. F.B.I.*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (quotation omitted). "Conclusory statements that the agency has reviewed relevant files are insufficient to support summary judgment." *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). Even where an affidavit meets the aforementioned conditions, "the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Founding Church of Scientology of Wash. D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979). The government must produce sufficient detail to allow a plaintiff to review the adequacy of a search, and cannot omit information essential to that review. *See Larson v. Dep't of State*, 2005 WL 3276303 (D.D.C. Aug. 10, 2005).

The FBI relies on the declaration of Mr. Argall, the Assistant Section Chief of the FBI's Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), to establish the adequacy of its search. (*See* FBI Mot. at 6-8; Decl. Argall ¶ 1.) According to the Argall Declaration, the FBI searched for records responsive to ICB's Disciplinary Action Request as related to Al Kandari in the CRS. (*Id.* ¶¶ 22-23.) The records maintained in the CRS consist of "administrative, applicant, criminal, personnel, and other files "compiled for law

enforcement purposes." (*Id.* ¶¶ 16, 22.) CRS is accessed via the Automated Case Support System ("ACS") and the General Indices. (*Id.* ¶¶ 16-17.) The General Indices are arranged in alphabetical order and consist of index cards on various subject matters. (*Id.* ¶ 17.) The General Indices entries contain both main and reference entries. (*Id.*)

The FBI conducted an automated search of the CRS General Indices in both the main and reference entries using "variations" of the spelling of Al Kandari's name. (*Id.* ¶¶ 22-23.) The FBI then conducted an automated search of only the main entries using variations of the Guantanamo internment serial number ("ISN") assigned to Al Kandari. (*See* FBI Mot. at 7; Decl. Argall at 9, n. 2.) The Argall Declaration demonstrates that the FBI conducted its search too narrowly, both in the manner and records in which the FBI conducted its search and in the terms that the FBI used during its search.

## 1.     The FBI Provided an Inadequate Description of its Records Systems.

A declaration must "'describe at least generally the structure of the agency's file system' which renders any further search unlikely to disclose additional relevant information." *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 322 (D. Conn. 2008) (*quoting Church of Scientology*, 792 F.2d at 150) (denying agency motion for summary judgment on adequacy of search where statements in declaration that database was "the only database that would reasonably contain the information requested" and "[a]ny and all information created by [the agency] regarding plaintiff would be maintained in [the database]," were insufficient to establish adequacy of agency's search). The declaration must "recite[] facts which enable the District Court to satisfy itself that all appropriate files have been searched." *Church of Scientology*, 792 F.2d at 151. As the court stated in *El Badrawi*, "[s]uch a description might include, for example, a list of databases to which [the agency] has access and a delineation of what types of records each database contains." 583 F. Supp. 2d at 300-01.

The FBI's declaration fails to sufficiently show that its limited search of the CRS was "reasonably calculated to uncover all relevant documents," and raises numerous questions regarding the sufficiency of its search. *Steinberg*, 23 F.3d at 551 (*quoting Weisberg*, 745 F.2d at 1485). First, the Argall Declaration notes that the FBI conducted only an "automated" search of the CRS General Indices at FBI headquarters and all field offices. (Decl. Argall ¶¶ 17, 22.) The FBI's failure to conduct a manual search here is particularly troubling given that the Argall Declaration indicates that the FBI, in fact, uses manual searches for the CRS General Indices. (*Id.* ¶ 17 ("[t]he General Indices consist of index cards . . . that are searched either manually or through the automated indices.").) Yet the FBI does not explain why it did not conduct even a limited manual search for records responsive to the ICB Request, nor does it attempt to explain why such a search would not yield responsive documents. In addition, the Argall Declaration is silent regarding the length of time it takes from when documents are created for the FBI to index files into the automated indices. (*See id.* at *passim.*) Nor does it state whether **all** files are indexed into the automated indices. (*See id.* at *passim.*) Thus, it is unclear whether the FBI's automated search would have uncovered any responsive records that have not been indexed into the CRS indices at the time that the FBI conducted its automated search, such as handwritten notes or reports. Given that U.S. government operations relating to detainees at Guantanamo are ongoing, particularly in light of the 2013 hunger strikes, it is only logical that there would be recent records responsive to the ICB Request (dated May 21, 2013) that had not yet been entered into the CRS' automated indices at the time that the FBI performed its search. The FBI, however, fails to address whether the automated indices would capture these records, or whether any other file systems would contain responsive records. ICB did not limit its Request only to

responsive records that are searchable through the automated indices, but instead requested *all* responsive information in the FBI's possession.

Nor does the Argall Declaration indicate whether the FBI's automated search of the CRS would have yielded any responsive email records. (*Id.* ¶¶ 16-20.) ICB requested all "documents stored in any form," including those stored "electronically, or by any other means." (*Id.* at Ex. A.) But the FBI has not explained whether it searched for responsive emails, if any, or whether it "possesses email archives[,] . . . whether there are backup tapes containing [responsive] emails and, if so, whether such backup tapes might contain emails no longer preserved on [employees'] computers." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011); *see also Houghton v. U.S. Dep't of State*, 875 F. Supp. 2d 22, 29-30 (D.D.C. 2012) (denying agency's motion for summary judgment as to adequacy of search where agency did not conduct searches for email records potentially responsive to request); *Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*, 2012 WL 6809301 at *8 (S.D.N.Y. Dec. 27, 2012) (*quoting Campbell*, 164 F.3d at 28) (directing agency to conduct search of email records where such records "are likely to turn up the information requested"). Instead, the FBI relies on its search of the CRS without explaining whether the CRS contains emails responsive to ICB's Request. (Decl. Argall ¶¶ 16-23.)

Finally, and as discussed further below, the Argall Declaration sets forth that the FBI limited its search solely to records contained in the CRS. (*Id.* ¶¶ 22-23.) According to the Argall Declaration, the CRS contains "files compiled for law enforcement purposes." (*Id.* ¶ 16.) The Argall Declaration, however, is silent with regard to whether the CRS *also* contains any handwritten notes, emails, or other documents not compiled for law enforcement purposes, or if the FBI instead stores any such documents in records system(s) separate from the CRS. (*See id.*

at *passim*.)   Instead, the FBI relies on its (automated) search of the CRS without adequately explaining whether the CRS contains all documents responsive to ICB's Request.  (Decl. Argall ¶¶ 16-23.)

**2.    The FBI's Search is Rendered Inadequate by the FBI's Prior Productions to ICB.**

The FBI's declaration and overall search are further rendered inadequate in light of the FBI's prior FOIA responses to ICB.  In 2009, ICB submitted a FOIA request to the FBI seeking disciplinary records related to Al Kandari.  (*See* Ex. A, ICB 2009 Disciplinary Request.)  On June 1, 2010, the FBI released to ICB eight pages of documents responsive to its disciplinary request.  (*See* Ex. B, ICB 2010 Disciplinary Records.)  Six of the eight pages consist of handwritten investigation notes detailing facts regarding the detention, treatment, and condition of Al Kandari. (*See id.*)  Furthermore, in 2011, ICB submitted a second FOIA request to the FBI seeking disciplinary records related to Al Kandari.  (*See* Ex. C, ICB 2011 Disciplinary Request.)  On July 31, 2012, the FBI, pursuant to agreement by the parties, produced ***91 pages*** of documents responsive, in part, to ICB's 2011 disciplinary action request.  (*See* Ex. D, ICB 2012 Records.)  In fact, the FBI's transmittal letter notes that the FBI ultimately reviewed ***416 pages*** of records prior to releasing the 91 pages of documents to ICB.  (*Id.* at 1.)  A significant majority of the 91 pages of responsive material is comprised of FBI emails.  (*Id.*)  The FBI's produced material also contains handwritten documents.   (*Id.*)   In view of its prior searches and productions relating to earlier time periods, the FBI's search here is particularly inadequate.  A mere two years after the FBI informed ICB that it had reviewed 416 pages of records, and ultimately released 91 pages of documents responsive, in part, to ICB's 2011 disciplinary action request, the FBI now asserts to the Court that it could find ***no*** files responsive to ICB's present

Disciplinary Action Request.  (Decl. Argall ¶ 23.)  The FBI has not explained the reason, if any, for such disparity in the number of responsive documents.

Simply put, the FBI has not established that its automated search for records in the CRS would have uncovered any handwritten notes or email records like those previously produced to ICB.  Nor has the FBI explained whether that it has searched any file system *other* than the CRS for any handwritten notes or emails.  FBI has previously released *handwritten* and *email records* to ICB in response to its prior requests, thereby evincing that a search for such records would be "likely to turn up the information requested" by ICB in its Request.  *Nat'l Immigration Project of the Nat'l Lawyers Guild*, 2012 WL 6809301 at *8.  The FBI's previous productions thus casts doubt on the adequacy of its search here, and require that the Court find that the FBI failed to conduct an adequate search under FOIA.

### 3.    The FBI Improperly Limited the Scope of its Search.

The FBI's declaration fails to demonstrate that its search was "tailored to the nature of" ICB's request.  *Rosenberg v. U.S. Dep't of Immigration & Customs Enforcement*, 959 F. Supp. 2d 61, 71-72 (D.D.C. 2013) (finding the FBI failed to conduct adequate search where it only searched CRS for responsive records).  Specifically, according to the Argall Declaration, the FBI limited its search solely to records contained in the CRS.  (Decl. Argall ¶¶ 22-23.)  Mr. Argall details that the "records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled *for law enforcement purposes*." (*Id.* ¶ 16 (emphasis added).)  The FBI, however, fails to establish that all records responsive to the Disciplinary Action Request are files "compiled for law enforcement purposes."  For example, based on the declaration, it would appear that the FBI's search in the CRS would not have yielded documents from Guantanamo compiled for counterterrorism or national security purposes responsive to ICB's Request.

Furthermore, the FBI does not aver that the CRS is the *only* collection of files likely to contain responsive documents.  Indeed, the FBI itself details that CRS is the "primary" records system, indicating there are additional records systems that may contain records responsive to ICB's Request.  (FBI Mot. at 6.)  The FBI's website explains that it has a "National Name Check Program (NNCP)" that is used to search "FBI's Universal Index (UNI) to identify **any** information contained in FBI records that may be associated with an individual." (*See* "A Guide to Conducting Research in FBI Records," *available at* http://www.fbi.gov/foia/a-guide-to-conducting-research-in-fbi-records (emphasis added).)  And, a news report states that the FBI has a database system, the Investigative Data Warehouse, that contains "more than 659 million records – including terrorist watch lists, intelligence cables and financial transactions – culled from more than 50 FBI and other government agency sources."  Nakashima, Ellen, *FBI Shows Off Counterterrorism Database*, The Washington Post, Aug. 30, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/08/29/AR2006082901520.html. The FBI has not explained why it did not also search the NNCP or Investigative Data Warehouse, or why records in the NNCP or Warehouse would not be responsive to ICB's Request.  Thus, the FBI fails to show it searched all systems "likely to possess the requested information." *Blackwell*, 680 F. Supp. 2d at 90.

### 4.    The FBI Failed to Use Adequate Search Terms.

Finally, the FBI failed to conduct a search using all terms reasonably calculated to produce responsive records.

The FBI searched for records in the CRS General Indices using variations of only Al Kandari's name and ISN number.  According to the Argall Declaration, the entries in the General Indices fall into two categories: (1) the main entries, which identifies files that are named for the corresponding subject; and (2) reference entries, which identify individuals, organizations or

subject matters referred in a file not explicitly named for those individuals, organizations or subject matters.  (Decl. Argall ¶ 17.)  The FBI then explains that searches in the General Indices concerning a particular individual, such as Al Kandari, "are made by searching the subject requested in the index."  (*Id.* ¶ 18.)

ICB's Request, however, asks for records "related to or reflecting any investigation into alleged abuse or mistreatment of [Al Kandari] while under the control of the USG," including, but not limited to, "records related to any disciplinary actions taken against USG personnel for engaging in such abuse or mistreatment."  (*Id.*, Ex. A.)  ICB did not limit its Request to information solely indexed under Al Kandari's name or ISN number.  The FBI's search would not have captured any subject matter documents with information relevant to ICB's Request that are *not* contained in entries filed or identified by Al Kandari's name or ISN number, such as documents that relate to or reflect investigations into alleged abuse or mistreatment of Al Kandari, even if they do not mention him by name.  For example, records that reference or relate to any alleged abuse or mistreatment of the "Kuwaiti detainees" would be responsive to ICB's Request, and would not have been captured by the FBI's limited search.  The FBI's failure to search for subject matter files on topics relevant to ICB's Request renders its search inadequate. *Nation Magazine,* 71 F.3d at 890 (finding agency failed to conduct adequate search where it limited its search to records "indexed and cross-indexed" to name of subject of request and scope of plaintiff's request included "subject matter files").

Further, ICB's Request was not limited solely to records containing Al Kandari's name or ISN number.  ICB specifically sought records related to "any investigations into alleged abuse or mistreatment of [Al Kandari]," including "records related to any disciplinary action ***taken against USG personnel*** for engaging in such abuse or mistreatment."  (Decl. Argall, Ex. A

(emphasis added).)  As noted above in connection with the "alleged abuse or mistreatment" part of the Disciplinary Request, a responsive document could refer to disciplinary action taken against U.S. Government personnel for engaging in abuse or mistreatment of the Kuwaiti detainees, without identifying them by name.  Yet the FBI does not explain its rationale for limiting its search to documents that only reference Al Kandari or his ISN number.

In addition, the FBI conducted a search of its CRS files by searching the following variations of Al Kandari's name:  "Alkandara, Fayiz Muhammad Ahmed," "Alkandari, Faez Mohamed Ahmed," "Alkandari Fayez," "Alkandari, Fayiz Mohammed Ahmed," Alkandari Mohammed," "Alkandari, Faiz Mohammed Ahmed," "Kandari, Fayiz Al, Kandari," "Fayiz Mohammed Ahmed Al," "Kandari, Faiz Al, Kandhari," "Faiz Mohammed Ahmed," and "Mohammed, Faiz."  (*Id.* ¶ 22.)  ICB previously challenged in this Court various federal agencies' responses to a separate set of FOIA requests filed on May 8, 2009.  (*See generally* Case No. 1:09-cv-02269 (JDB).)  Pursuant to this Court's scheduling order and the agreement of the parties, the FBI produced disciplinary records relating to Al Kandari on June 1, 2010.  (*See* Ex. B, ICB 2010 Disciplinary Records.)  The eight pages of documents produced at that time list six name variations for Al Kandari, *five* of which, "Al-Kandhari," "Kandhari," "Abu Khaled," "Faez Mohammed Al Kandari," and "Faiz Mohammed Ahmed Al-Kandhari," the FBI failed to use in either its search of the CRS main or reference entries.  (*Compare* Decl. Argall ¶¶ 22, 23 *with* Ex. B, ICB 2010 Disciplinary Records.)  As such, the FBI's search was not reasonably calculated to uncover all relevant documents.  *See Int'l Counsel Bureau v. U.S. Dep't of Def.*, 864 F. Supp. 2d 101 (D.D.C. 2012) (directing agency to conduct additional search using alternative spelling of detainee's name); *Negley v. F.B.I.*, 658 F. Supp. 2d 50, 60-61 (D.D.C. 2009) ("Plaintiff rightly points out that the search terms were full versions of Negley's name.

The FBI did not search for other permutations of the name, and therefore the search was not reasonably calculated to turn up all responsive files.").

Finally, the FBI apparently failed to search even the CRS reference entries using variations of Al Kandari's ISN.  The Argall Declaration instead states that the FBI conducted a search for records using this ISN of *only* the CRS main entries.[2]  (Decl. Argall at 9, n.2.)  The FBI does not provide information to justify this limitation, particularly where it conducted searches in both the main and reference entries when using Al Kandari's name.  As such, the FBI's search was not "reasonably calculated to uncover all relevant documents."  *Rosenberg*, 959 F. Supp. 2d at 70 (quotation omitted).

The FBI has failed to demonstrate that it conducted an adequate search for records related to the Al Kandari portion of the Disciplinary Action Request.  The Court should therefore grant ICB's Cross-Motion for Summary Judgment on the adequacy of the FBI's search, deny the FBI's Motion for Summary Judgment on this issue, and order that the FBI conduct a new search responsive to ICB's FOIA Request.

## V.   THE FBI'S CATEGORICAL WITHHOLDING OF RECORDS RELATED TO AL ODAH WAS IMPROPER

The FBI's Motion asks this Court to approve the FBI's improper refusal to process ICB's Disciplinary Action Request for records as related to Al Odah under Exemptions 6 and 7(c).

First, the FBI asserts that ICB has not exhausted its administrative remedies because it submitted its public interest showing to OIP instead of directly to the FBI.  This argument is a red herring.  The FBI acknowledged that it received and reviewed ICB's assertion of public

---

[2] The Argall Declaration notes that it conducted a "second search of the CRS to locate cross-references responsive to plaintiff's May 21, 2013 request using the same search terms" described in paragraph 22.  (Decl. Argall ¶ 23.)  Because paragraph 22 does not address the ISN search, which is instead discussed in a footnote, it is unclear that the FBI conducted this "second search" with respect to the ISN number.  In the very least, the FBI should be directed to clarify the parameters of its "second search."

interest, and has set forth its legal position responding to ICB's assertion in its Motion before this Court.

Second, the FBI has failed to establish that all records relevant to this Request qualify as "law enforcement" records under Exemption 7(c).

Finally, the *de minimis* privacy interests that are implicated by the FBI's mere **acknowledgment** of the existence of records here are clearly outweighed by the strong public interest in the release of these records.

**A.    ICB Exhausted Its Administrative Remedies For The Disciplinary Action Request.**

The FBI first contends that ICB has failed to exhaust its administrative remedies for the Disciplinary Action Request as related to Al Odah because ICB sent its discussion of the public interest in the Al Odah documents to OIP, instead of directly back to the FBI.  (FBI Mot. at 12-13 ("Plaintiff must first present its public interest justification to FBI before administratively appealing FBI's response with respect to the Al Odah portion of the request. . . .").)  This argument is little more than a distraction.

The FBI attempts to create a superficial distinction between ICB's filing with OIP and the response purportedly required by the FBI.  In response to ICB's Request seeking Al Odah records, the FBI responded that ICB needed to provide either a waiver from Al Odah, proof that Al Odah was deceased, or a "demonstrat[ion] that the public interest in disclosure outweighs personal privacy interests."  (Decl. Argall, Ex. G at 1.)  ICB specifically responded to the FBI's request for further information in the context of its appeal of the FBI's initial denial, stating that "we are **writing in response** to the Department of Justice ("DOJ"), [FBI] regarding FOIA No. 1222330-0."  (*Id.*, Ex. H (emphasis added).)  ICB's appeal was solely addressed to discussion of why the public interest outweighed any privacy interests at stake.  The FBI **concedes** that it

18

reviewed ICB's argument and concluded – improperly, as demonstrated below – that the public interest did not outweigh the privacy interests.  (FBI Mot. at 12-13; Decl. Argall ¶ 25.)  Neither the FBI nor OIP informed ICB of this conclusion, and ICB's "deemed denial" complaint followed.  Now, the FBI asks for summary judgment upholding that conclusion.  (FBI Mot. at 12-13 ("because disclosing the requested materials would constitute an unwarranted invasion of personal privacy, FBI is entitled to summary judgment.").)

For all practical purposes, therefore, the FBI treated ICB's appeal to OIP as a response to its initial request for ICB's explanation of how the public interest in the requested documents outweighed the privacy interests.  The FBI has no basis now to object that ICB did not respond directly to the FBI with regard to this issue.  The DoJ FOIA regulations[3] do not require that ICB submit any further information directly to the FBI prior to the processing of ICB's Request.  The applicable FOIA regulations state that submission of supporting information such as a waiver or proof of death "will *help* the processing of your request."  28 C.F.R. § 16.3 (emphasis added).  The regulation does not state that the request is somehow defective or incomplete *without* such information, or that such information can only reach the recipient through a particular administrative channel.  *See Calvert v. United States*, 662 F. Supp. 2d 27, 32 (D.D.C. 2009) (rejecting the FBI's argument that plaintiff failed to exhaust administrative remedies where plaintiff did not respond directly to the FBI's request for information and instead filed an administrative appeal because such a response is "not required" under DoJ FOIA regulations and finding that the FBI did not sufficiently justify its failure to process plaintiff's request under Exemptions 6 and 7(c)).

---

[3] Because there are no FOIA regulations specific to the FBI, the FBI, a component of DoJ, follows the DoJ FOIA regulations.  28 C.F.R. § 16.1.

**B.      The FBI Fails To Establish That The Requested Documents Qualify As "Law Enforcement" Records Under Exemption 7(c).[4]**

To withhold documents under Exemption 7(c), the FBI must first establish that the documents were "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7)(c).  The D.C. Circuit has established a two-part test whereby an agency can establish that the records or information in question were "compiled for those purposes":  (1) a connection between the individual or incident and a possible security risk or violation of federal law; and (2) a rational nexus between the investigation at issue and the agency's law enforcement duties.  *See Jefferson v. Dep't of Justice, Office of Prof'l Responsibility*, 284 F.3d 172, 177 (D.C. Cir. 2002); *Pratt v. Webster*, 673 F.2d 408, 419-21 (D.C. Cir. 1982).  In assessing whether records are compiled for law enforcement purposes, the "focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding."  *Jefferson*, 284 F.3d at 176-77 (D.C. Cir. 2002) (internal citations and quotations omitted).

While the FBI's decision to invoke Exemption 7 is entitled to deference, this "'deferential' standard of review is not . . . 'vacuous.'"  *Campbell*, 164 F.3d at 32 (*quoting Pratt*, 673 F.2d at 419).  To that end, courts have cautioned that "FBI records are not law enforcement records [under FOIA] simply by virtue of the function that the FBI serves."  *Vymetalik v. F.B.I.*, 785 F.2d 1090, 1095 (D.C. Cir. 1986).  Thus, where, as here, the FBI's declaration "'fail[s] to supply facts' in sufficient detail" to apply the two-part rational nexus test, the Court "may not grant summary judgment for the agency."  *Campbell*, 164 F.3d at 32 (*quoting Quinon v. F.B.I.*, 86 F.3d 1222, 1229 (D.C. Cir. 1996)).

---

[4] ICB does not contest that the requested documents qualify as "personnel and medical files and similar files" for purposes of Exemption 6.  5 U.S.C. § 552(b)(6).

Here, the FBI relies on a single sentence in its declaration stating that "plaintiff sought FBI information that, if it exists, would have been compiled for law enforcement purposes." (Decl. Argall ¶ 25; *see also* FBI Mot. at 15-16 ("As confirmed in the Argall Declaration, which is entitled to deference on the topic, those records would thus fall within the category of records compiled for law enforcement purposes.").)   This conclusory sentence is "not sufficient" to establish that *all* documents relevant to ICB's Request were compiled for law enforcement purposes. *Parker*, 852 F. Supp. 2d at 11-12 (finding DOJ failed to establish records compiled for law enforcement purposes where agency relied on single statement in declaration averring that "[a]ll information at issue in this case was compiled for law enforcement purposes.").  The FBI puts forth no evidence to establish the circumstances under which the requested files were compiled, let alone show how there is a "rational nexus" between the action giving rise to any responsive documents and the Agency's law enforcement duties.  *See Jefferson*, 284 F.3d at 179 (noting that "a *Glomar* response was inappropriate in the absence of an evidentiary record produced by OPR to support a finding that all OPR records . . . are law enforcement records."); *Shapiro v. Dep't of Justice*, --- F.Supp. 2d ---, 2014 WL 953270 at *13 (D.D.C. March 12, 2014) (rejecting the FBI's withholding of documents under Exemption 7 where the FBI failed to provide "specific facts" showing any colorable claim of rationality between the object of its investigation and its asserted law enforcement duties).  In the absence of such evidence, the FBI cannot ask the Court simply to presume that any responsive records were compiled for law enforcement purposes.

Notably, ICB's Disciplinary Action Request did not seek records limited solely to those "compiled for law enforcement purposes."  ICB instead requested, in part, all records related to any alleged breaches or violations by Al Odah of any governing rules of discipline and behavior

during his detention, and all records related to any investigations into the alleged mistreatment or abuse of Al Odah by U.S. Government personnel.  (*See* Decl. Argall, Ex. A.)  This category of records could reasonably include documents unrelated to any law enforcement purposes, such as those compiled for national security or counterterrorism purposes, or with respect to an internal investigation conducted by the FBI or another federal agency or task force.  *See Jefferson*, 284 F.3d at 178-79 (finding DoJ could not rely on "bare assertion" that all records were "law enforcement" records where request sought, in part, records related to internal agency review).

Moreover, ICB's Request is not limited to records related to investigations conducted by the ***FBI***.  (*See* Decl. Argall, Ex. A.)  ICB's Request could encompass, for example, an investigation by the Department of Defense if the records related to that investigation were housed in the FBI's record systems.  As noted, ICB's Request could also reasonably include records related to an internal investigation conducted by ***another*** federal agency or task force.

As will be discussed below, FBI personnel have played multiple roles related to Guantanamo, from on-site interrogator to visiting auditor, to participant in the Guantanamo Review Task Force.  Not all (or even most) of these roles are ***per se*** law enforcement roles, as the FBI now insists, citing Mr. Argall's single sentence.

It is possible that, after the FBI searches for and reviews responsive documents related to Al Odah, it may assert that the records may be properly categorized as "law enforcement" documents, and therefore the standards of Exemption 7(c) apply.  But in the current posture, where the FBI is seeking to escape any obligation to even look __**for**__ (let alone look __**at**__) the documents, the Court cannot grant the FBI's Motion for Summary Judgment on this factually unsupported assumption, and cannot credit the FBI's reliance on a heightened standard for

release of 7(c) law enforcement documents.  (*See*, *e.g.*, FBI Mot. at 15 ("the analysis under Exemption 7(c) tilts more in favor of nondisclosure.").)

### C. The *De Minimis* Privacy Considerations Do Not Outweigh The Strong Public Interest In Disclosure Of Records Responsive To The Disciplinary Action Request.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(c), in turn, exempts "records or information compiled for law enforcement purposes . . . to the extent that production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(c).  "Both provisions require agencies and reviewing courts to balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information."  *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 846 F. Supp. 2d 63, 69 (D.D.C. 2012) (quotation omitted).

The FBI's Motion sets forth an unrecognizable version of the prevailing test under Exemptions 6 and 7(c) for the existence of a cognizable public interest under those exemptions. The FBI argues that ICB can overcome ***any*** privacy interest in the requested records only by credibly alleging that the FBI has done something illegal.  (FBI Mot. at 17-18.)  The FBI states flatly that "[o]nly the conduct of the agency holding the requested record can constitute a public interest."  (*Id.* at 17.)  As noted below, the applicable standard is far broader than that.

In addition, categorical assertions of exemption of records from disclosure under FOIA, such as the FBI's *Glomar* response, are held to a strict standard.  Such blanket exclusions are "disfavored," and may be employed "[o]nly when the range of circumstances included in the category 'characteristically supports an inference' that the statutory requirements for exemption are satisfied."  *Bartko v. U.S. Dep't of Justice*, --- F.Supp.2d ----, 2014 WL 3834343 at *6

(D.D.C. Aug. 5, 2014) (*quoting Nation Magazine,* 71 F.3d at 893 (*quoting Dep't of Justice v. Landano*, 508 U.S. 165, 177 (1993)).  In this case, the FBI has failed to establish that the privacy interests of a ***publicly acknowledged*** detainee at Guantanamo categorically support the FBI's refusal to process ICB's Request.

Although the privacy language in Exemption 7(c) is broader than the privacy language in Exemption 6, the courts "employ a similar analysis to decide whether a FOIA request may be categorically denied on either ground." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 840 F. Supp. 2d 226, 231 (D.D.C. 2012); *see also U.S. Dep't of Def. v. Fed. Labor Relations Auth.,* 510 U.S. 487, 495, 496 n. 6 (1994).  The only significant difference between the balancing tests under Exemption 6 and Exemption 7(c) is that under Exemption 6 the government must prove that the invasion of privacy is "clearly unwarranted." *U.S. Dep't of State v. Ray,* 502 U.S. 164, 177 (1991).  Courts, accordingly, have held that Exemption 7(c) "establishes a lower bar for withholding material" than Exemption 6. *Am. Civil Liberties Union v. U.S. Dep't of Justice,* 655 F.3d 1, 6 (D.C. Cir. 2011); *see also Beck v. U.S. Dep't of Justice,* 997 F.2d 1489, 1491 (D.C. Cir. 1993).  "As a result, if the records and information the FBI seeks to withhold in this case were 'compiled for law enforcement purposes,' the Court need only address whether the agency has properly withheld these documents under Exemption 7(c)." *Braga v. F.B.I.*, 910 F. Supp. 2d 258, 266-67 (D.D.C. 2012).  As discussed above, the FBI has not demonstrated that its records relating to Al Odah, if any, qualify as "law enforcement records," and thus as potentially subject to Exemption 7(c).  However, the definitions of privacy interest and public interest under both Exemption 6 and 7(c) are essentially identical as implemented by reviewing courts.  The difference arises in the manner in which courts apply the balancing test under the two exemptions.  As noted, the FBI should not be granted the additional

discretion to withhold documents under the more stringent 7(c) balancing test until it makes the required showing that the records are "law enforcement records."

"Under both exemptions, the court must first assess whether the third party has more than a *de minimis* privacy interest in the requested material.  If such an interest exists, the court must then determine whether the third-party's privacy interest is outweighed by the public interest in the disclosure." *Citizens for Responsibility & Ethics in Wash.*, 840 F. Supp. 2d at 231.  "To assess the . . . categorical balancing of private and public interests with respect to [FBI's] *Glomar* policy," the Court must "compare the two interests to determine if 'the balance characteristically tips in one direction.'" *Nation Magazine*, 71 F.3d at 893-94 (*quoting Reporters Committee*, 489 U.S. at 776).  Accordingly, "[u]nless the invasion of privacy is clearly unwarranted, the public interest in disclosure must prevail." *Los Angeles Times Commc'ns LLC v. U.S. Dep't of Labor*, 483 F. Supp. 2d 975, 981 (C.D. Cal. 2007).

1.      **The FBI Fails to Establish a Substantial Privacy Interest in Records Related to Al Odah.**

The FBI's argument is premised on the assertion that, if the FBI acknowledges the existence of any documents related to Al Odah, it will impermissibly tar him by association with the law enforcement mission of the FBI.  However, in light of the actual facts of the U.S. Government's very public, very controversial operations at Guantanamo, the Agency's claim is not credible.

The FBI is categorically withholding, in fact refusing to even search for, responsive documents related to Al Odah, a third party, purportedly to protect his privacy interests.  (FBI Mot. at 16 ("Al Odah maintains a privacy interest in investigative records in which he is mentioned").)  Thus, the Court must first determine whether revelation of the mere ***fact*** that Al Odah was the subject of FBI records would implicate a cognizable privacy interest under

Exemptions 6 and 7(c).  *See Wiggins v. Nat'l Credit Union Admin.*, 2007 WL 259941 at * 7-8 (D.D.C. Jan. 30, 2007) (internal citations omitted).  To constitute a privacy interest under FOIA, the claimed interest must be "substantial."  *Multi Ag Media LLC v. Dep't of Agric.,* 515 F.3d 1224, 1229-30 (D.C. Cir. 2008).  While "individuals have an obvious privacy interest cognizable under Exemption 7(c) in keeping secret the fact that they were subjects of a law enforcement investigation," where, as here, the "secret" is already known, there can be no cognizable privacy interest at stake. *Nation Magazine*, 71 F.3d at 894.

The public is well aware that Al Odah is imprisoned in Guantanamo, and that he has been accused of involvement with Al Qaeda and with terrorism.  Press accounts have fully described the circumstances of his capture and the nature of the U.S. Government's allegations against him.  Further, public records from the June 4, 2014 Periodic Review Board ("PRB") hearing discuss, in detail, the nature and basis for the U.S. Government's allegations against Al Odah and the PRB's reasoning for why "continued law of war detention of [Al Odah] does not remain necessary to protect against a continuing significant threat to the security of the United States." Below is a mere sampling of these press accounts and public records:

- **The U.S. Government Unclassified PRB Summary:**  "[Al-Odah] in August 2001 traveled from Kuwait to Afghanistan, where he probably attended terrorist training and possibly fought alongside the Taliban and al-Qa'ida. . . . A body of reporting suggests he underwent training in Afghanistan and wittingly engaged in extremist activity while in Afghanistan.  [Al Odah] during interviews repeatedly has denied involvement in terrorism but admitted meeting with a Taliban representative after he arrived in Afghanistan and said he transited Tora Bora during Operation Enduring Freedom."[5]

- **The PRB Final Determination:**  "The Periodic Review Board, by consensus, determined that continued law of war detention of [Al Odah] does not remain necessary to protect against a continuing significant threat to the security of the United States.  In making this determination, the Board noted the

---

[5]    Guantanamo    Detainee    Profile,    March    19,    2014,    *available    at* http://www.prs.mil/ReviewInformation/FullReviewpage.aspx.

detainee's low level of training and lack of a leadership position in al-Qaeda or the Taliban."[6]

- **L.A. Times**: "Odah was captured in Afghanistan near the Tora Bora Mountains in late 2001 by a Pakistani militia. The U.S. military said he was carrying an AK-47 assault rifle, had sworn allegiance to Al Qaeda and was recruiting terrorist candidates."[7]

- **Associated Press**: "A department memo dated Jan. 2, 2008, said al-Odah was believed to be a member of al-Qaida who had sworn allegiance to Osama bin Laden, the group's deceased leader. The detainee's name was listed on al-Qaida affiliated documents, and he was a reported member of an al-Qaida cell in London. He also was believed to have participated in hostilities against U.S. and coalition forces."[8]

- **Agence France-Press**:  "Fawzi Al-Odah appeared at a hearing on July 14 and, by consensus, the Periodic Review Board 'determined that continued law of war detention of the detainee does not remain necessary to protect against a continuing significant threat to the security of the United States.' However, in the case of fellow Kuwaiti inmate Fayez Al Kandari, the board 'considered that the detainee almost certainly retains an extremist mindset and had close ties with high-level Al-Qaeda leaders in the past.' His continued detention therefore 'remains necessary to protect against a continuing significant threat to the security of the United States.'"[9]

- **FoxNews**: "Al Odah, a Kuwait citizen, was captured in Tora Bora, Afghanistan, in December 2001. Eight years later, a federal court concluded after a three-day hearing that a 'preponderance of evidence' showed he 'more likely than not' had been a part of the Taliban and Al Qaeda, according to court documents."[10]

---

[6]  Unclassified Summary of Final Determination, July 14, 2014, *available at* http://www.prs.mil/ReviewInformation/FullReviewpage.aspx.

[7] Phelps, Timothy, *Kuwaiti Fawzi Odah Wins Approval for Release From Guantanamo Prison*, July 25, 2014, L.A. TIMES, *available at* http://www.latimes.com/nation/nationnow/la-na-nn-kuwaiti-guantanamo-release-20140725-story.html.

[8] *US clears Kuwaiti for Release From Guantanamo*, ASSOCIATED PRESS, Jul. 25, 2014, *available at* http://bigstory.ap.org/article/us-clears-kuwaiti-release-guantanamo.

[9] *One of Five 9/11 Accused to be Tried Separately*, AGENCE FRANCE-PRESSE, July 25, 2014, *available at* http://news.yahoo.com/one-five-9-11-accused-tried-separately-225816764.html.

[10] *Court Ruling for Detainee Reignites Legal, Political Debate About Releasing Gitmo Detainees*, FOXNEWS, *available at* http://www.foxnews.com/politics/2014/08/17/court-ruling-for-detainee-reignites-legal-political-debate-about-gitmo-closing/.

- **Al-Jazeera America**: "Fawzi al-Odah is not a high-profile prisoner, but he is among the 38 Guantánamo prisoners who are still marked for indefinite detention. The U.S. has accused him of being associated with Al-Qaeda and the Taliban, a charge he denies."[11]

- **Al-Jazeera**: "Al Odah has been accused of being associated with al Qaeda and the Taliban."[12]

An individual's privacy interest in concealing the fact that he is the subject of an investigation or enquiry by an agency is "undoubtedly . . . diminish[ed]" when "the public already knows who he is [and] what he was accused of." *Citizens for Responsibility & Ethics in Wash.* 746 F.3d at 1092 (*quoting Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998)).[13] The public is well aware of who Al Odah is, and what he is accused of.

The public is similarly aware that the FBI has likely had extensive contact with Al Odah over the past 12 years of his captivity, insofar as the FBI has played a role at Guantanamo since shortly after the arrival of the first prisoners detained in the wake of the September 11, 2001 attacks, including Al Odah.  Multiple press accounts, public reports, and documents that the government itself has released to the public show that the FBI has been an active participant in the operations of Guantanamo and in the government's treatment of the detainees.

- FBI agents have been reported as working with SOUTHCOM officials as interrogators at Guantanamo.[14]

---

[11] Fenton, Jenifer, *Indefinite Wait Continues for Kuwaiti Father of Gitmo Detainee*, AL JAZEERA AMERICA, June 5, 2014, *available at* http://america.aljazeera.com/articles/2014/6/5/indefinite-wait-gitmofather.html.

[12] Fenton, Jenifer, *Kuwaiti Families in Legal Limbo at Guantanamo*, AL JAZEERA, Dec. 29, 2011, *available at* http://www.aljazeera.com/indepth/features/2011/12/201112298544422981.html.

[13] The Argall Declaration makes note of the recent *Citizens for Responsibility and Ethics in Washington* case, but says that it did not apply, as in that case there was "a federally acknowledged existence of an investigation." (Decl. Argall, p. 11 n.4.)  However, the point of *Citizens for Responsibility* is that the information was known to the public, not that the FBI, or the subject of the records himself, had been responsible for that knowledge.

[14] Press Release, Center for Constitutional Right, Rights Groups Release Documents Obtained in FOIA Case Relating to Secret Detention, Extraordinary Rendition, and Torture Program (Feb.

Footnote continued on next page

- As early as 2006, accounts from Guantanamo described press attempts to interview officers of the "U.S. Federal Bureau of Investigations (FBI), who interrogate the Al Qaeda prisoners."[15]

- Jane Mayer, in her book "The Dark Side," describes FBI analysts visiting Guantanamo, evaluating the threat presented by individual Guantanamo detainees, and presenting reports on their findings to Bush administration officials in 2003: "the FBI expert told the assembled Bush legal team that in his view, there were no more than fifty detainees worth holding in Guantanamo."[16]   Insofar as this review involved a detainee-by-detainee review of those held in Guantanamo, it therefore likely involved the FBI specifically examining the facts of Al Odah's case.

- Undated interrogation reports of Guantanamo detainees, recorded by DoD interrogators, publicly released under FOIA, describe the FBI's interrogation methods: "Detainee also mentioned that there were allegations that the FBI and Department of Defense conduct interrogations differently and that he saw a picture of an individual in 'a dark room' bleeding from his testicles. Interrogator did not pursue a line of questioning with regard to detainee's comments. Interrogator did not ask detainee who showed him the picture or where he heard about the FBI allegations."[17]

- Documents that the FBI has released to ICB in response to previous FOIA requests:   "On 29JUN02, Faez Mohammed AL KANDARI, a.k.a. Abu KHALED, Internment Serial Number (ISN) US9KU-00552DP, was interviewed by Special Agency [redacted] Federal Bureau of Investigation . . . at Camp Delta, Guantanamo Bay, Cuba."[18]

These references and many more establish without a doubt the FBI's long-term, integrated involvement at the camp.  It is likely because of this experience that FBI officials also played a significant role on the Guantanamo Review Task Force convened by President Obama in 2009, including "FBI agents who had worked on investigations met with Task Force members to

---

Footnote continued from previous page

12, 2009), *available at* http://www.ccrjustice.org/newsroom/press-releases/rights-groups-release-documents-obtained-foia-case-relating-secret-detention (noting FBI interrogation memoranda among disclosed Guantanamo documents).

[15] Shafey, Mohammad, *Experiencing Obesity at Camp V*, CAGEPRISONERS (March 9, 2006) *available at* http://old.cageprisoners.com/articles.php?id=16151.

[16] MAYER, JANE, THE DARK SIDE 187 (2009).

[17] *See* ICB JIG 231.

[18] (*See* Ex. B, ICB 2010 Disciplinary Records.)

answer their questions."[19]   Again, in this situation, as with the briefings to the Bush administration narrated by Ms. Mayer, the FBI is a **source of information** regarding Guantanamo, and about the specific situations of various individual detainees.

It is in this context, therefore, that the FBI now insists that, if it even acknowledges the existence of any documents related to Al Odah in its possession, it will harm Al Odah's privacy interests.  This assertion cannot stand in the light of the facts as they exist.  There may be details in the FBI's responsive documents that qualify for withholding under one or both of these exceptions.  These assertions can be dealt with once the FBI completes its review.  But at this point, the FBI cannot shrink from its obligation under FOIA to conduct a search for records responsive to ICB's Request.

> **2.  The Public Interest in Disclosure is Significant and Requires that the FBI Process ICB's Disciplinary Action Request.**

Al Odah has, at best, a *de minimis* interest in nondisclosure of the fact that various FBI documents may relate to him and his activities in Guantanamo.  As such, the clear public interest in the conditions and status of the prisoners in Guantanamo must tip the balance in favor of, in this case, requiring the FBI to process ICB's FOIA request relating to documents detailing any alleged breaches or violations by Al Odah of any governing rules of discipline or behavior, as well as records relating to or reflecting any investigations into alleged abuse of mistreatment of Al Odah.  Even if the Court chooses to credit the FBI's argument and accept the existence of a privacy interest in this case, the public interest in conditions and events at Guantanamo is enormous, as the courts repeatedly have recognized.

Whether the public interest in disclosure warrants invasion of personal privacy is determined by the extent to which disclosure advances "the basic purpose of the Freedom of

---

[19] *See* Guantanamo Review Task Force, Final Report at 20 (Jan. 22, 2010).

Information Act to open agency action to the light of public scrutiny, thereby furthering the citizens' right to be informed about what their government is up to." *Am. Civil Liberties Union*, 655 F.3d at 6 (internal citations and quotations omitted); *see also Reporters Comm.*, 489 U.S. at 773. In that regard, "[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] purpose." *Reporters Comm.*, 489 U.S. at 773. However, "the mere fact that records pertain to an individual's activities does not necessarily qualify them for exemption" because "[s]uch records may still be cloaked with the public interest if the information would shed light on agency action." *Nation Magazine*, 71 F.3d at 894-95.

   a.    **ICB Does Not Need to Accuse the FBI of a Crime to Trigger the FBI's FOIA Obligations.**

   The FBI's suggestion that ICB must show "evidence that would warrant a belief by a reasonable person that [an] alleged [FBI] impropriety might have occurred" misconstrues the public interest requirement. (FBI Mot. at 18 (*quoting Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).) The D.C. Circuit has made clear that such a showing is required *only* when the requester asserts that the public interest at issue involves "allegations of illegal or otherwise improper conduct. . . ." *Citizens for Responsibility & Ethics in Wash.*, 840 F. Supp. 2d at 235 (citing *Am. Civil Liberties Union*, 655 F.3d at 14).

   ICB *does not* allege that the FBI is engaged in either illegal or negligent action. "Therefore, it is not correct that [ICB] must provide compelling evidence of any such conduct" on part of the FBI in order to demonstrate a substantial public interest in the requested records. *Id.* In its 2014 decision of *Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, the Court of Appeals for the D.C. Circuit made this point utterly clear, in relation to a FBI *Glomar* assertion under the precise circumstances presented here. 746 F.3d at 1095. The FBI asserted that it was entitled to assert a *Glomar* response unless the requester

specifically accused the FBI of impropriety or crime, and the Court of Appeals directly rejected that assertion:

> CREW alleges no impropriety on the part of the FBI or the DOJ; it has nonetheless established a sufficient reason for disclosure independent of any impropriety: "[M]atters of substantive law enforcement policy are properly the subject of public concern, whether or not the policy in question is lawful." Whether government impropriety might be exposed in the process *is beside the point*.

*Id.* (emphasis added) (footnotes and internal quotations omitted).  Accordingly, contrary to the FBI's suggestion, there is "no requirement that a FOIA requester must always allege that the Government is acting illegally in order to establish the existence of a substantial public interest." *Citizens for Responsibility & Ethics in Wash.*, 840 F. Supp. 2d at 235.

### b.   There Is a Strong Public Interest in the Conditions and Status of the Guantanamo Detainees, Including Al Odah.

As noted above, no cognizable privacy interest exists in the mere *fact* of responsive documents here.  Although the Court, absent this cognizable privacy interest, "need not linger over the balance" between the competing interests, *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989), the public interest in disclosure of documents responsive to ICB's Request is substantial.  The FBI's argument is premised on the assertion that acknowledging the existence of any documents related to Al Odah is to harm him by association with the law enforcement mission of the FBI.  However, the operation of Guantanamo and the matters sought in the Disciplinary Action Request are subjects of intense public interest.

There can be no doubt of the "long-standing and ongoing public interest" in Guantanamo generally and in the government's treatment of detainees at Guantanamo in particular.  *Dhiab v. Obama*, Civ No. 05-1457 (GK) (Oct. 2, 2014).  Disclosure of information responsive to ICB's Request would "shed[] light on" the FBI's conduct with regard to detainees at Guantanamo, and

"contribute significantly to public understanding of the operations or activities of the government." *Citizens for Responsibility & Ethics in Wash.*, 840 F. Supp. 2d at 236 (quotations omitted). Indeed, this Court, in finding that the public interest in disclosure of photographs related to the detainees outweighed the "slight" privacy interests at stake under Exemption 6, recognized that documents related to detainees at Guantanamo "are of significant' public interest." *Int'l Counsel Bureau v. U.S. Dep't of Def.*, 723 F. Supp. 2d 54, 66-67 (D.D.C. 2010) (finding privacy interest outweighed by public interest in photographs). Likewise, courts in this Circuit have repeatedly acknowledged that disclosure of records related to detainees at Guantanamo will serve the public interest in knowing "what their government is up to":

> Public interest in Guantanamo Bay generally and these proceedings specifically has been unwavering. The public's understanding of the proceedings, however, is incomplete without the factual returns. ***Publically disclosing the factual returns[20] would enlighten the citizenry and improve perceptions of the proceedings' fairness***.

*In re Guantanamo Bay Litig.*, 624 F. Supp. 2d 27, 37 (D.D.C. 2009) (emphasis added). Indeed, the Court, in rejecting the government's motion to seal a preliminary injunction proceeding regarding the force-feeding procedures employed at Guantanamo, recently recognized that "public interest in Guantanamo Bay generally and these proceedings specifically has been unwavering,' and concluded that: "***With such a long-standing and ongoing public interest at stake***, it would be particularly egregious to bar the public from observing the credibility of live witnesses, the substance of their testimony, ***whether proper procedures are being followed***, and whether the Court is treating all participants fairly." *Dhiab*, Civ No. 05 Civ. 1457 (GK) (Oct. 2, 2014) (emphasis added). The next day, the Court granted a motion to unseal 28 videotapes of

---

[20] The "factual return" is in reference to the government's compilation of unclassified information on the detainees at Guantanamo submitted in response to the detainees' writs of habeas corpus. *See In re Guantanamo Bay Litig.*, 624 F. Supp. at 30-31.

force-feedings and forcible cell extractions ("FCE") of a detainee at Guantanamo, concluding that the public interest in disclosure of this evidence outweighed the government's "vague, speculative . . .[and] implausible" justification for opposing disclosure of the forced-feeding and FCE videos. *Dhiab*, No. 05 Civ. 1457 (GK) (Oct. 3, 2014).

Similar reasoning applies to documents related to how the FBI investigated any disciplinary infractions by Al Odah or government abuse or mistreatment towards Al Odah during his imprisonment at Guantanamo. With such a "long standing and ongoing public interest at stake," it is "particularly egregious" for the FBI to **not even process** ICB's Request for documents on these subject matters.

In addition, as the Court recognized in *Dhiab*, the strong public interest in the treatment and condition of detainees has been particularly heightened in recent years due to the hunger strikes by detainees at Guantanamo in 2013.[21] *Dhiab*, Civ No. 05 Civ. 1457 (GK) (Oct. 2, 2014) ("[i]t is no secret that Mr. Dhiab's case has received a good deal of publicity in the press.") The government's use of force-feedings in response to the hunger strikes remains the subject of ongoing debate and significant public scrutiny.[22] Public records indicate that Al Odah has

---

[21] *See, e.g.*, Carter, Chelsea J. and Liptak, Kevin, *Doctors to Obama: Let Us Treat Hunger-Striking Detainees at Guantanamo*, CNN, June 19, 2013, *available at* http://www.cnn.com/2013/06/18/health/guantanamo-hunger-strike/; Associated Press, *Military Updates on Guantanamo Hunger Strikes to End*, USA TODAY, Sept. 23, 2013, *available at* http://www.usatoday.com/story/news/nation/2013/09/23/us-military-ending-gitmo-hunger-strike-updates/2857273/; al-Alwi, Moath, *Guantanamo Inmate: 'We Will Remain on Hunger Strike,'* AL JAZEERA AMERICA, Oct. 15, 2013, *available at* http://america.aljazeera.com/articles/2013/10/15/hunger-strike-guantanamo.html.

[22] *See, e.g.*, *Pillay Says Guantanamo Detention Regime is in "Clear Breach of International Law" and Should be Closed*, U.N. HUMAN RIGHTS (April 5, 2013), http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=13212&LangID=E; Barclay, Eliza and Naudziunas, Jessica, *Why Doctors Oppose Force-Feeding Guantanamo Hunger Strikes*, NPR, July 11, 2013, *available at* http://www.npr.org/blogs/thesalt/2013/07/10/200751527/why-doctors-oppose-force-feeding-guantanamo-hunger-strikers.

previously engaged in hunger strikes during his time at Guantanamo.[23]   The production of documents relevant to ICB's Request would necessarily encompass any disciplinary actions taken in response to any such hunger strikes.   Accordingly, ICB's Request would "contribut[e] significantly to the public understanding of the operations or activities of the government" in response to the hunger strikes.   *Gilman v. U.S. Dep't of Homeland Sec.*, 2014 WL 984309 (D.D.C. Mar. 14, 2014) (quotation omitted).

> ### c.   The Privacy Interests in the Documents do not "Characteristically" Outweigh the Strong Public Interest in Documents Responsive to the Disciplinary Action Request.

To uphold the FBI's "refusal to conduct a search at all," the Court must find that the privacy interests affected by the disclosure of potentially responsive documents "characteristically" outweigh this significant and routinely recognized public interest.   *Bartko,* 2014 WL 3834343 at *6.   The FBI has not characterized the types of likely documents in any way, and thus has given the Court no basis to determine that they are "characteristically" of such a type that they must outweigh the public's interest in the conditions and status of the Guantanamo detainees.   As this Court stated in *Bartko*, the possible range of documents held by an agency is too broad to admit of such vague, absolute refusal as is presented by the FBI's *Glomar* assertion here:

> The nature of the information that would arise from such a search, however, does not admit of such categorical conclusions. Perhaps, for example, the FBI might unearth documents that merely summarize the individuals' trial testimony or synthesize other innocuous and public facts about them. Such records would be unlikely to implicate a privacy interest that could outweigh the public's interest in disclosure. ***But because the Bureau did not conduct a search at all, neither it nor the Court has anything on***

---

[23] *See* Rosenberg, Carol, *FOIA Suit Reveals Guantanamo's 'Indefinite Detainees*,*'* MIAMI HERALD,   June   17,   2013,   *available   at*   http://www.miamiherald.com/news/nation-world/world/americas/article1952557.html.

> **which to come to a contrary conclusion**. Under the circumstances, the Court will order that the FBI search for records concerning the three coconspirators and either release them or provide an appropriate Vaughn Index.

*Id.* (emphasis added) (citing *Citizens for Responsibility & Ethics in Wash.*, 746 F.3d at 1095–96 (rejecting government's refusal to search for category of records under Exemptions 6 and 7(c)). The same analysis applies here.  The FBI has played many roles in relation to Guantanamo over the past decade and more, and it cannot say with any certainty that every document in its files carries a stigma (assuming such stigma is even possible in light of the state of the public facts regarding Al Odah).

The FBI is seeking to excuse itself from complying with FOIA in direct contravention of recent decisions of this Court, offering only a few vague assertions in the Argall Declaration. The facts, however, show that Al Odah's status and history at Guantanamo, and by extension with the FBI, are well known, minimizing the relevant privacy interest.  In contrast, the interest of the public in the situation of Guantanamo detainees is, and remains, high.  The balance between these two elements is clear, and cannot possibly justify granting the FBI's plea that it be allowed to do nothing.

## VI.  CONCLUSION

For the foregoing reasons, ICB respectfully requests that the Court deny the FBI's Motion for Summary Judgment, grant ICB's Cross-Motion for Summary Judgment, and order the FBI to conduct an adequate search for records responsive to ICB's Disciplinary Action request as related to both Al Kandari and Al Odah and subsequently produce any records responsive to ICB's Request.

Date:   October 15, 2014                          Respectfully submitted,

                                                  /s/  Ronald A. Schechter
                                                  Ronald A. Schechter, D.C. Bar # 245019
                                                  Ronald D. Lee, D.C. Bar # 411516
                                                  Stuart W. Turner, D.C. Bar # 478392
                                                  Emma V. Broomfield, D.C. Bar # 988927
                                                  Dana E. Peterson, D.C. Bar # 1006952
                                                  ARNOLD & PORTER LLP
                                                  555 12th Street, NW
                                                  Washington, DC 20004
                                                  (202) 942 5000

                                                  *Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

INTERNATIONAL COUNSEL BUREAU,  )
                               )
            Plaintiff,       )
                               )
      v.                  )       Civil Action No. 13-01591 (JDB)
                               )
UNITED STATES DEPARTMENT   )
OF DEFENSE *et al.,*           )
                               )
           Defendants.   )
_____)

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE
AND RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Plaintiff International Counsel Bureau ("ICB"), pursuant to Local Rule 7(h), hereby submits the following Statement of Material Facts Not in Genuine Dispute in support of its Cross-Motion for Summary Judgment in this case and Response to Defendant Federal Bureau of Investigation's ("FBI") Statement of Material Facts ("FBI's Statement").

**I.      ICB's Statement of Material Facts Not in Genuine Dispute**

1.      On May 21, 2013, ICB submitted a FOIA request to the FBI seeking the following records (the "Disciplinary Action Request"):

> *"1.    Any and all records created on or after September 30, 2011, relating to or reflecting any alleged breaches or violations by Fayiz Mohammed Ahmed Al Kandari and/or Fawzi Khaled Abdullah Fahad Al Odah of any governing rules of discipline and/or behavior during their detention by the United States Government ("USG"). This request includes, but is not limited to, records related to any disciplinary actions taken by personnel in response to such breaches.*
>
> *2.    Any and all records created on or after September 30, 2011, relating to or reflecting any investigations into alleged abuse or mistreatment of Fayiz Mohammed Ahmed Al Kandari and/or Fawzi Khaled Abdullah Fahad Al Odah while under the control of*

> *the USG.  This request includes, but is not limited to, records related to any disciplinary actions taken against USG personnel for engaging in such abuse or mistreatment."*

(R.20-1, Ex. A.)

2.    With respect to the Disciplinary Action Request as related to Fayiz Mohammed Ahmed Al Kandari ("Al Kandari"), the FBI acknowledged receipt of the Request by letter dated August 16, 2013.  (R.20-1, Ex. B.)   The FBI assigned this request administrative tracking number ("FOIPA number") 1222321.  (*Id.*)  The FBI advised ICB that the FBI was searching the indices to its Central Records System ("CRS") for information responsive to this request.  (*Id.*)

3.    By letter dated August 20, 2013, the FBI informed ICB that the FBI conducted an additional search of indices to its CRS, and that the FBI was "unable to identify main file records responsive to the FOIPA."  (R.20-1, Ex. C.)

4.    On September 10, 2013, ICB filed an administrative appeal of the FBI's August 20, 2013 response with the Office of Information Policy ("OIP").  (R.20-1, Ex. D.)  By this appeal, ICB challenged the adequacy of the FBI's search for records responsive to its Disciplinary Action request.  (*Id.*)

5.    OIP acknowledged receipt of ICB's administrative appeal by letter dated October 22, 2013.  (R.20-1, Ex. E.)

6.    By letter dated December 16, 2013, OIP informed ICB that OIP was closing the appeal file because ICB had filed this instant action.  (R.20-1, Ex. F.)

7.    The FBI's Motion for Summary Judgment and the Declaration of Dennis J. Argall (the "Argall Declaration") address records maintained only by the FBI's CRS.  (R.20 at 6-8; R.20-1 at *passim*.)

8.    The FBI did not conduct a manual search for records responsive to ICB's Request.  (R.20-1 ¶ 22.)

9.      The Argall Declaration makes no reference to the length of time it takes the FBI to index files to the automated indices.  (R.20-1 at *passim*.)

10.     The Argall Declaration does not state whether all FBI records are indexed into the automated indices.  (R.20-1 at *passim*.)

11.     The Argall Declaration does not state whether the CRS contains any handwritten notes, emails or other documents not compiled for law enforcement purposes.  (R.20-1 at *passim*.)

12.     In 2009, ICB submitted a FOIA request to the FBI for records pertaining to Al Kandari related to the same subject matter as ICB's Disciplinary Action Request (the "2009 Disciplinary Request").  (ICB Mot., Ex. A, ICB 2009 Disciplinary Request.)

13.     On or about June 1, 2010, the FBI released records responsive to the 2009 Disciplinary Request to ICB.  (ICB Mot., Ex. B, ICB 2010 Disciplinary Records.)  The FBI's transmittal letter explained that it had reviewed eight pages of records, and that it was releasing the eight pages to ICB.  (*Id.* at 1.)  The FBI's production of documents contains six pages of handwritten investigative notes that the FBI deemed responsive to ICB's 2011 Disciplinary Request.  (*See id.*)

14.     ICB's Disciplinary Action Request sought all "documents stored in any form," including those stored "electronically, or by any other means."  (R.20-1, Ex. A.)

15.     The Argall Declaration makes no reference to the scope of any search for emails responsive to ICB's Request.

16.     In 2011, ICB submitted a FOIA request to the FBI for records pertaining to Al Kandari related to the same subject matter as ICB's Disciplinary Action Request (the "2011 Disciplinary Request").  (ICB Mot., Ex. C, ICB 2011 Disciplinary Request.)

17.     On or about July 31, 2012, the FBI released records responsive, in part, to the 2011 Disciplinary Request to ICB.  (ICB Mot., Ex. D, ICB 2012 Records.)  The FBI's transmittal letter explained that it had reviewed 416 pages of records.  (*Id.* at 1.)  The FBI ultimately released 91 pages of documents to ICB.  (*Id.*)  The FBI's production of documents contains emails and handwritten documents the FBI deemed responsive, in part, to ICB's 2011 Disciplinary Request.  (*See id.*)

18.     ICB's 2013 Disciplinary Action Request was directed to "any and all records" responsive to its Request.  (R.20-1, Ex. A.)

19.     The FBI conducted its search for records responsive to ICB's Request by searching only the CRS.  (R.20-1 ¶ 22.)

20.     The Argall Declaration does not aver that the CRS is the only database or system likely to contain documents responsive to the Disciplinary Action request.  (R.20-1 at *passim*.)

21.     The FBI utilizes other databases and systems to maintain records in addition to the CRS records system.  (R.20 at 6.)

22.     The Argall Declaration makes no reference to whether the FBI searched all databases and systems of records likely to possess the requested information.  (R.20-1 at *passim*.)

23.     ICB's Request sought records "related to or reflecting any investigation into alleged abuse or mistreatment of [Al Kandari] while under control of the USG, including, but not limited to, records related to any disciplinary actions taken against U.S. Government personnel engaging in such abuse or mistreatment.  (R.20-1, Ex. A.)

24.     The FBI limited its search of the CRS General Indices to those index cards that specifically identify Al Kandari's name in a "main" or "reference" entry, and to those index cards that specifically identify Al Kandari's ISN in a "main" entry.  (R.20-1 ¶¶ 17-18, p. 9 n.2.)

25.     The FBI's search would not have captured documents with information relevant to ICB's Request that are not contained in entries filed or identified by Al Kandari's name or ISN number.

26.     The FBI's search would not have captured any documents with information that relates to or reflects investigations into alleged abuse or mistreatment of the "Kuwaiti detainees."

27.     The FBI conducted a search of its CRS files by searching the following terms: "Alkandara, Fayiz Muhammad Ahmed," "Alkandari, Faez Mohamed Ahmed," "Alkandari Fayez," "Alkandari, Fayiz Mohammed Ahmed," Alkandari Mohammed," "Alkandari, Faiz Mohammed Ahmed," "Kandari, Fayiz Al, Kandari," "Fayiz Mohammed Ahmed Al," "Kandari, Faiz Al, Kandhari," "Faiz Mohammed Ahmed," and "Mohammed, Faiz."  (R.20-1 ¶ 22.)

28.     The FBI did not conduct a search of its CRS main and reference entries using all known name variations for Al Kandari.  (R.20-1 ¶¶ 22-23; ICB Mot., Ex. B, ICB 2010 Disciplinary Records.)

29.     The FBI did not conduct a search of its reference entries using the ISN assigned to Al Kandari.  (R.20-1 at 9, n. 2.)

30.     With respect to the Disciplinary Action Request as related to Fawzi Khaled Abdullah Fahad Al Odah ("Al Odah"), by letter dated August 16, 2013, the FBI acknowledged receipt of the Request.  (R.20-1, Ex. G.)  By this letter, the FBI advised ICB that the records requested concerned a third party, and requested that ICB provide an authorization from the individual, a proof of death for the individual, or a justification that the public interest in disclosure outweighs personal privacy interests.  (*Id.*)  The FBI stated that, without this information, the FBI could neither confirm nor deny the existence of any records responsive to the Disciplinary Action Request, and that any such responsive records would nevertheless be

exempt from disclosure pursuant to FOIA Exemption (b)(6) and (b)(7)(c).  (*Id.*)  The FBI also informed ICB of its administrative appeal rights.  (*Id.*)

31.    Under the DOJ FOIA regulations, ICB was not required to provide the requested information prior to the FBI's processing of the request.  *See* 28 C.F.R. § 16.3.

32.    On September 10, 2013, ICB timely filed a response to the FBI's August 16, 2013 letter with the OIP explaining that the public interest in disclosure of records outweighed any potential personal privacy interests in the records.  (R.20-1, Ex. H.)

33.    On October 22, 2013, OIP acknowledged receipt of ICB's response.  (R.20-1, Ex. I.)

34.    The FBI subsequently reviewed ICB's submission to OIP and determined that the public interest in disclosure of records did not outweigh the privacy interests.  (R.20 at 12-13.)

35.    To date, ICB has not received notification from OIP regarding the status of ICB's submission to the OIP.  (R.20 at 4.)  ICB did not receive any notification from the FBI regarding the FBI's review of ICB's submission.  (*Id.*)

36.    ICB exhausted its administrative remedies for the Disciplinary Action Request as related to Al Odah.

37.    Because of its determination that a *Glomar* response was appropriate for ICB's request as it related to Fawzi Al Odah, the FBI did not conduct any searches of its systems of records in response to this request as it related to Al Odah.  (R.20 at 4, 8-18; R.20-1 at 5, 9-11.)

38.    The FBI has provided no evidence in support of its withholding of documents under Exemptions 6 and 7(c).  (*See* R.20-1 at *passim*.)

39.    The FBI has not demonstrated that all records responsive to ICB's Request constitute "law enforcement records" under Exemption 7(c).  (*See* R.20-1 at *passim*.)

40.     The fact that Al Odah is presently detained by the U.S. Government at Guantanamo, and that he has been accused of involvement with Al Qaeda and with terrorism, is open and notorious, having been widely publicized.  (*See, e.g.*, ICB Mot. at 25-28.)

41.     Public records from the June 4, 2014 Periodic Review Board ("PRB") hearing discuss, in detail, the nature and basis for the U.S. Government's allegations against Al Odah and the PRB's reasoning for why "continued law of war detention of [Al Odah] does not remain necessary to protect against a continuing significant threat to the security of the United States."

42.     The public is aware that the FBI has played an active role in the operations of Guantanamo and in the government's treatment of detainees at Guantanamo since shortly after the arrival of first prisoners detained in the wake of the September 11, 2001 attacks, including Al Odah.  (*See, e.g.*, ICB Mot. at 28-30; ICB Mot., Ex. B, ICB 2010 Disciplinary Records.)

43.     There is significant and ongoing public interest in the conditions and status of the detainees at Guantanamo, including Al Odah.

44.     Public disclosure of documents responsive to ICB's Request will contribute significantly to public understanding of the U.S. Government's actions towards detainees at Guantanamo.

## II.     ICB's Response To The FBI's Statement

1.     No dispute.

2.     No dispute.

3.     Undisputed that ICB's May 21, 2013 FOIA request is the third request that ICB has submitted to the FBI for records pertaining to Al Kandari relating to the same subject matter. ICB notes that the 2009 Request is dated May 8, 2009.  Undisputed that the 2009 Request included a waiver of privacy by Al Kandari.  ICB has no basis to dispute that this waiver permitted the FBI to conduct a "by name" search for responsive records.  ICB has no basis to

dispute the FBI's position regarding the effect of this waiver on subsequent searches submitted by ICB for related information pertaining to Al Kandari.   Undisputed that the FBI released records responsive to the 2009 Request in June 2010.   Undisputed that the 2011 Request was dated September 30, 2011 and that the 2011 Request updated the 2009 Request.   Undisputed that the FBI released records responsive to the 2011 Request in July 2012.

4.      (FBI's Statement ¶ 3)[1] No dispute.

5.      (FBI's Statement ¶ 4) No dispute.

6.      (FBI's Statement ¶ 5) ICB has no basis to dispute that the FBI's search included a search of both main and reference entries of the general indices of the CRS using certain variations of Al Kandari's name.   ICB has no basis to dispute that the FBI's search included a search of the main entries of the general indices of the CRS using Al Kandari's internment serial number.

7.      (FBI's Statement ¶ 6) Undisputed that ICB filed an appeal with the OIP by letter dated September 10, 2013 challenging the adequacy of the FBI's search for documents responsive to ICB's Disciplinary Action Request based on the contents of the FBI's August 20, 2013 denial letter.

8.      (FBI's Statement ¶ 7) No dispute.

9.      (FBI's Statement ¶ 8) No dispute.

10.     (FBI's Statement ¶ 9) No dispute.

---

[1] ICB notes that, while its response to the FBI's Statement is numbered sequentially to respond to the corresponding paragraph in the FBI's Statement, the FBI's Statement contains two paragraphs with the number "three."   ICB therefore provides the corresponding paragraph in the FBI Statement for ease of reference for the Court.

11.     (FBI's Statement ¶ 10) Disputed; ICB responded to the FBI's letter on September 10, 2013 by submitting a letter to OIP explaining that the public interest in disclosure outweighed the personal privacy interests.

12.     (FBI's Statement ¶ 11) ICB does not dispute that it responded to the FBI's letter on September 10, 2013 by submitting a letter to OIP explaining that the public interest in disclosure outweighed the personal privacy interests.

13.     (FBI's Statement ¶ 12) ICB does not dispute that OIP acknowledged receipt of ICB's September 10, 2013 submission by letter dated October 22, 2013.

14.     (FBI's Statement ¶ 13) ICB has no basis to dispute that the FBI concluded the public interest that ICB identified in its administrative appeal did not outweigh privacy interests. Whether ICB's identified public interest outweighed the privacy interests at stake is a disputed legal determination, and the record contains facts that dispute the FBI's contention that this determination was proper.  (*See* ICB Mot. at *passim*.)

15.     (FBI's Statement ¶ 14) No dispute.

16.     (FBI's Statement ¶ 15) No dispute.

17.     (FBI's Statement ¶ 16) No dispute.

Date:   October 15, 2014                       Respectfully submitted,

                                               /s/  Ronald A. Schechter
                                               Ronald A. Schechter, D.C. Bar # 245019
                                               Ronald D. Lee, D.C. Bar # 411516
                                               Stuart W. Turner, D.C. Bar # 478392
                                               Emma V. Broomfield, D.C. Bar # 988927
                                               Dana E. Peterson, D.C. Bar # 1006952
                                               ARNOLD & PORTER LLP
                                               555 12th Street, NW
                                               Washington, DC 20004
                                               (202) 942 5000

                                               *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2014, a true and accurate copy of the foregoing and the accompanying proposed order was filed electronically and served on the following individuals via the CM/ECF System:

Stephen J. Buckingham
Kristina A. Wolfe
U.S. Department of Justice
20 Massachusetts Ave., NW
Washington, D.C. 20530
*Counsel for Defendants*

/s/  Ronald A. Schechter
Ronald A. Schechter